286 F.Supp. 597 (1968)
In the Matter of GRAIN MERCHANTS OF INDIANA, INC., et al., Bankrupts. Mark L. FRANCE, Trustee,
v.
UNION BANK AND SAVINGS COMPANY, BELLEVUE, OHIO, Respondent.
No. 7259.
United States District Court N. D. Indiana, Fort Wayne Division.
July 8, 1968.
*598 Hoffman, Moppert & Solomon, Fort Wayne, Ind., for Grain Merchants.
George E. Fruechtenicht of Rothberg, Gallmeyer, Fruechtenicht & Logan, Fort Wayne, Ind., for the Trustee.
Paul W. Philips of Helmke, Philips & Beams, Fort Wayne, Ind., for respondent.

MEMORANDUM OF DECISION AND ORDER
ESCHBACH, District Judge.
This matter is before the court on a petition by the respondent, Union Bank and Savings Company, Bellevue, Ohio, for review of an order entered February 9, 1968 by the referee in bankruptcy requiring the bank to turn over to the trustee in bankruptcy, Mark L. France, the sum of $52,441.49. The referee in bankruptcy held that this amount represented preferences which were voidable by the trustee under the provisions of Section 60 of the Bankruptcy Act, 11 U. S.C. § 96. This court has jurisdiction under 28 U.S.C. § 1334. This petition for review of an order of a referee in bankruptcy is authorized by Section 39 of the Bankruptcy Act, 11 U.S.C. § 67. This court concludes that the order of the referee in bankruptcy entered February 9, 1968 must be set aside, and the matter must be remanded to the referee for further determinations.
The funds which the referee in bankruptcy has ordered the Union Bank and Savings Company, Bellevue, Ohio, (hereinafter referred to as "Union Bank") to turn over to the trustee of the bankrupt, Grain Merchants of Indiana, Inc., (hereinafter "Grain Merchants") represent collections upon accounts receivable of Grain Merchants which were created after September 20, 1966. These accounts receivable were transferred to Union Bank as security for a loan made by Union Bank to Grain Merchants on September 20, 1966 pursuant to a security agreement made between Union Bank and Grain Merchants in September of 1965. The bank's security interest in these accounts receivable was valid and perfected under Indiana law. However, the referee in bankruptcy held that the accounts receivable created after September 20, 1966 were transferred to the Union Bank when the individual accounts were created, and were therefore transferred "for or on account of an antecedent debt" within the meaning of Section 60 of the Bankruptcy Act, 11 U. S.C. § 96. Having found that the trustee had established the other elements of a voidable preference, the referee voided the transfer of these accounts and ordered the collections on account of these transfers turned over to the trustee. The question for determination in this petition for review of the referee's order is the correctness of the referee's holding that these accounts were transferred to the Union Bank, for purposes of Section 60 of the Bankruptcy Act, at the *599 time when individual accounts receivable were created.
On September 17, 1965, Grain Merchants executed a security agreement with the Union Bank. By the terms of this security agreement, Union Bank was to have a security interest in all accounts receivable then belonging to Grain Merchants or thereafter received by or belonging to Grain Merchants. This security interest was to secure loans to be made by the Union Bank to Grain Merchants in amounts which were limited by the terms of the security agreement. At the same time, Grain Merchants also executed in favor of Union Bank a second security agreement which granted the bank a security interest in inventory. However, only the security agreement concerning accounts receivable is involved in this action. Financing statements relating to these security agreements were timely and appropriately filed.
On December 10, 1965, Grain Merchants executed a promissory note in the amount of $30,000.00, payable on demand, to the Union Bank. This note was specifically secured by warehouse receipts representing 35,000 bushels of corn. On December 27, 1965, Grain Merchants executed a second promissory note to the Union Bank, this one in the amount of $20,000.00. This note was secured by warehouse receipts representing 25,000 bushels of corn.
In addition to the two notes described above, Grain Merchants executed a series of promissory notes in favor of Union Bank which were secured in part by accounts receivable under the security agreement which had been executed September 17, 1965. Beginning no later than January of 1966, Grain Merchants executed a new promissory note in favor of Union Bank on the 20th day of each month. The note which had been executed the previous month was then canceled. Grain Merchants executed such a note on September 20, 1966 in the amount of $100,000.00 in favor of Union Bank. (The face amount of the note executed by Grain Merchants on September 20 was actually $111,100.00, but the bank unilaterally treated it as a note for $100,000.00, and it may be considered as a note in the latter amount for purposes of this action.) Upon receipt of the note executed September 20, 1966, the Union Bank canceled a note executed August 20, 1966 in the same amount. The referee held that cancellation of the August 20 note constituted consideration for the September 20 note, and the trustee has not questioned this holding. Thus the Union Bank may be considered as having extended credit to Grain Merchants in the amount of $100,000.00 on September 20, 1966.
On September 30, 1966, Grain Merchants ceased doing business. On October 3, 1966, the Union Bank took certain steps to apply assets then in the hands of Grain Merchants toward payment of the existing indebtedness of Grain Merchants to Union Bank. As of October 3, the balance on the two notes executed in December of 1965, together with interest then owing, totaled $51,659.52. In addition, the balance on the note executed September 20, 1966, including accrued interest, totaled $100,596.03.
Grain Merchants had on deposit in the Union Bank on October 3 the sum of $18,979.21. That day the bank paid four checks drawn against the account of Grain Merchants totaling $181.72. In addition, one check in the amount of $869.00 which Grain Merchants had deposited to its account was returned to the bank unpaid, and Union Bank accordingly reduced Grain Merchants' balance by $869.00. The net amount of Grain Merchants balance at Union Bank on October 3 was $17,928.49. Union Bank set this amount off against the indebtedness of Grain Merchants. This offset is permitted under Section 68 of the Bankruptcy Act, 11 U.S.C. § 108, and the trustee has not challenged it.
The Union Bank also seized corn which was covered by warehouse receipts issued to Union Bank to secure the two notes executed in December of 1965. The Union Bank sold this corn for $13,802.15. The trustee does not *600 question Union Bank's right to proceeds from the sale of this corn.
In addition, on October 3 Grain Merchants deposited with the Union Bank the sum of $28,197.73, which represented collections on accounts receivable. The referee did not recognize this as a completed deposit, and did not permit the Union Bank to treat this amount as an offset under Section 68 of the Bankruptcy Act, 11 U.S.C. § 108. The Union Bank has not questioned this holding of the referee. The referee permitted the Union Bank to retain $14,622.20 out of the amount which Grain Merchants attempted to deposit on October 3. This amount represented collections on accounts receivable which arose on or before September 20, 1966, the last date on which Union Bank extended credit to Grain Merchants. The referee held that because these accounts receivable arose on or before September 20, the bank's lien on these accounts receivable did not attach on account of an antecedent debt, and the bank's lien was therefore not a preference as that term is defined in Section 60 of the Bankruptcy Act, 11 U. S.C. § 96.
However, out of the funds which Grain Merchants turned over to the Union Bank on October 3, the other $13,575.53 represented collections on accounts receivable which came into existence after September 20, 1966. The referee has ordered that these funds be returned to the trustee.
In addition to the collections from accounts receivable which Grain Merchants turned over to the Union Bank on October 3, Grain Merchants also turned over to Union Bank all its then outstanding, uncollected accounts receivable. The Union Bank then proceeded to collect these accounts and apply the proceeds against the remaining indebtedness of Grain Merchants. These collections totaled $99,443.70. Of this amount, $60.577.74 represented collections on accounts receivable which came into existence on or before September 20, 1966. The referee permitted Union Bank to retain these funds. The remaining $38,865.96 represented collections on accounts receivable which arose after September 20, 1966. The referee has ordered that these funds be turned over to the trustee.
For clarity, these financial transactions should be summarized. Grain Merchants' total indebtedness to Union Bank was $152,255.55, of which $100,596.03 was created on September 20, 1966, and the remainder was created in December of 1965. Against this amount, Union Bank has collected from all sources the sum of $159,372.07. Of these collections, $7,116.52 represents an excess over the total indebtedness of Grain Merchants to Union Bank, and this amount is now in escrow. From sources other than accounts receivable, Union Bank collected $31,730.64. From accounts receivable coming into existence on or before September 20, 1966, Union Bank collected $75,199.94. From accounts receivable which came into existence after September 20, 1966, Union Bank collected $52,441.49. This last sum is the amount which the referee has ordered Union Bank to turn over to the trustee.
Grain Merchants filed its petition in bankruptcy on October 27, 1966. It was insolvent, as that term is defined in the Bankruptcy Act, at all times after June 27, 1966.
The referee held that the transfers of accounts receivable to Union Bank took place at the time that the individual accounts came into existence and that the transfers of accounts receivable which came into existence after September 20, 1966 were therefore transfers on account of an antecedent debt. The referee also held that the effect of the transfers of accounts receivable was to enable the Union Bank to obtain a greater percentage of its debt than other creditors of the same class. The referee therefore concluded that the transfers of accounts receivable which came into existence after September 20, 1966 constituted preferences as that term is defined in Section 60(a) of the Bankruptcy Act, 11 U. S.C. § 96(a). The referee also found *601 that at the time of transfer, the Union Bank had reasonable cause to believe that Grain Merchants was insolvent. Accordingly, the referee held that the preferences were voidable under Section 60(b) of the Bankruptcy Act, 11 U.S.C. § 96(b), and ordered the $52,441.49 collected as a result of the preferences to be turned over to the trustee.
The referee in bankruptcy permitted Union Bank to retain $75,199.94 in collections from accounts receivable created on or before September 20, 1966. The referee permitted the Union Bank to apply all of this amount against the indebtedness of $100,596.03 which was created on September 20, 1966. Because the collections from accounts receivable which the referee permitted the Union Bank to retain did not exceed the amount of the September 20 indebtedness, the referee did not consider whether, under the agreements between the bank and Grain Merchants, the accounts receivable were also intended to secure the indebtedness created in December of 1965.
The security agreement which Grain Merchants executed in favor of the Union Bank in September of 1965 purported, in accordance with Indiana State law, to give Union Bank a security interest in all of Grain Merchants' uncollected accounts receivable then in existence or thereafter arising. Such a security agreement is specifically authorized in Burns' Ind.Stat. § 19-9-204(3), which provides that, with exceptions not relevant here, "* * * a security agreement may provide that collateral, whenever acquired, shall secure all obligations covered by the security agreement."
This provision from the Uniform Commercial Code validates what is sometimes called a "floating lien." Burns' Ind.Stat. § 19-9-205 provides that a security interest may be valid notwithstanding power in the debtor to collect and apply the proceeds of accounts receivable without accounting to the secured party. Thus, the Uniform Commercial Code as adopted in Indiana provides for financing arrangements whereby a debtor may transfer a security interest in a stock of accounts receivable, but retain possession of the accounts, collect them, and create new ones. The security interest "floats" over the accounts receivable in existence at any given moment. The security agreement between Grain Merchants and Union Bank in the instant case was just such a "floating" financing arrangement.
The Union Bank timely and appropriately filed a financing statement covering the security agreement between Grain Merchants and the bank. This financing statement fully complied with the provisions of the Indiana Uniform Commercial Code and was filed well in advance of the creation of the particular accounts receivable which are involved in this case. The bank contends that under the Indiana Uniform Commercial Code, other creditors of Grain Merchants became subordinated to the bank's security interest in all Grain Merchants' accounts receivable, present and future, at the time Grain Merchants filed its financing statement. Therefore, contends the bank, the accounts receivable should all be considered to have been transferred at the time the financing statement was filed, well in advance of the bank's extension of credit to Grain Merchants. If, as the bank contends, the time of transfer was the date of filing the financing statement, then the transfers of accounts receivable were not transfers "for or on account of an antecedent debt" and were therefore not preferences as defined in Section 60(a) of the Bankruptcy Act, 11 U.S.C. § 96(a).
The bank further contends that even if each account receivable is considered to have been transferred at the time it came into existence, the transfers nevertheless are not "for or on account of an antecedent debt" because of another provision of the Indiana Uniform Commercial Code, Burns' Ind.Stat. § 19-9-108. This section provides in relevant part:

"When after-acquired collateral not security for antecedent debt.Where a secured party makes an advance * * * or otherwise gives new value which is to be secured in whole or in *602 part by after-acquired property his security interest in the after-acquired collateral shall be deemed to be taken for new value and not as security for an antecedent debt if the debtor acquires his rights in such collateral * * * in the ordinary course of his business * * *."
This section of the Indiana Uniform Commercial Code would, if applied, govern the disposition of this case. However, the referee held that this Indiana statute conflicts with Section 60 of the Bankruptcy Act and therefore cannot be given effect. The referee found that the accounts receivable created after September 20, 1966 were transferred "on account of an antecedent debt." Having found that the trustee had established the other elements of a voidable preference, the referee voided the transfers and ordered the collections on account of these transfers turned over to the trustee.
This case raises a difficult problem of construction and application of Section 60(a) of the Bankruptcy Act, 11 U.S.C. § 96(a). This court holds that the transfer to the Union Bank of accounts receivable pursuant to the security agreement executed between Grain Merchants and the Union Bank in September of 1965 should be considered to have taken place when Union Bank filed its financing statement. This conclusion is based upon a careful consideration of the language and purposes of the Bankruptcy Act and, in particular, of Section 60 of that Act. Because of this conclusion as to the proper construction of Section 60 of the Bankruptcy Act, it has been unnecessary to consider the effect of Burns' Ind.Stat. § 19-9-108 upon the construction of Section 60.
The time when personal property, such as an account receivable, is deemed to have been transferred to a creditor, for the purposes of Section 60, is governed by Section 60(a) (2), 11 U.S.C. § 96(a) (2):
"For the purposes of subdivisions (a) and (b) of this section, a transfer of property other than real property shall be deemed to have been made or suffered at the time when it became so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee. * * *"
When a transfer become perfected to the extent required by Section 60(a) (2) is a matter of state law. Matthews v. James Talcott, Inc., 345 F.2d 374 (7th Cir. 1965). See McKenzie v. Irving Trust Co., 323 U.S. 365, 65 S.Ct. 405, 89 L.Ed. 305 (1945).
The provision for time of transfer in Section 60(a) (2) of the Bankruptcy Act looks to the time when, under the applicable state law, subsequent lien creditors are precluded from establishing a claim superior to that of the transferee. Under Burns' Ind.Stat. § 19-9-204 (3), the Union Bank could and did acquire a security interest in Grain Merchants' stock of accounts receivable valid against "lien creditors" at the time Union Bank filed its financing statement as required by the Indiana Uniform Commercial Code. Only if Union Bank's security interest is regarded as a separate interest in individual accounts may it be said that the transfer of those accounts occurred at the moment individual accounts came into existence. Regarding Union Bank's security interest in Grain Merchants' stock of accounts receivable as a security interest in individual accounts is a highly unrealistic view of the transaction, a view which is not in accord with business practice and which is not required by the language or purposes of Section 60 of the Bankruptcy Act.
The general purpose of the Bankruptcy Act was succinctly stated in H.R.Rep.No. 1293, 81st Cong., 1st Sess. (1949), 2 U.S. Code Cong.Service, 81st Cong., 2nd Sess. (1950), p. 1985, at 1986:
"Traditionally, it is the primary office of the Bankruptcy Act to protect creditors, both secured and unsecured; to marshal the bankrupt's assets, and to distribute them among his creditors equitably and ratably, in accordance *603 with their respective rights and interests.
"It follows from these broad general principles, as well as from the basic provisions of the Bankruptcy Act itself, that
"(A) A trustee in bankruptcy occupies the position of a `universal' judgment or lien creditor, with all such a creditor's remedies (Bankruptcy Act, sec. 70); and
"(B) Except as may be necessary to avoid preferences or fraudulent transfers, he takes the bankrupt's assets subject to all valid liens and encumbrances thereon, as conferred by applicable State law (Bankruptcy Act, secs. 57(e) and (h), sec. 67(b), and sec. 70)."
If the Congressional purpose of an equitable and ratable distribution of assets among creditors of the bankrupt is to be achieved, an alert creditor should not, shortly before bankruptcy, be permitted to deny to the trustee, and thus deny to the general creditors of the bankrupt, assets which under state law the general creditors might reasonably have expected to apply in satisfaction of their claims. In order to avoid such an inequitable result, Congress provided in Section 60 of the Bankruptcy Act that certain events were to be treated as "preferences," and under certain circumstances these preferences were made voidable at the instance of the trustee in bankruptcy. As originally enacted, Section 60 failed to recognize the possibility that a transfer might be completed between a debtor and a creditor long before other creditors of the bankrupt were made aware of it. See 3 Collier, Bankruptcy § 60.06, n.7 (14th ed. 1967). Beginning in 1903, Congress attempted through a series of amendments to deal with the problem of liens against the property of a bankrupt which were not recorded as required by state law until shortly before bankruptcy. In 1903 Congress added to the definition of a "preference" the following language:
"* * * Where the preference consists in a transfer, such period of four months shall not expire until four months after the date of recording or registering of the transfer, if by law such recording or registering is required." See 3 Collier, Bankruptcy, supra at § 60.05, n.14.
Additional amendments to Section 60 in 1910 and in 1926 continued this same effort to protect general creditors against unrecorded liens.
A series of Supreme Court decisions soon showed that Congress had not achieved the desired objective of protecting general creditors against "secret" liens. In Sexton v. Kessler & Co., 225 U.S. 90, 32 S.Ct. 657, 56 L.Ed. 995 (1912), a debtor, later a bankrupt, segregated certain securities and held them as security for the benefit of one of its creditors. Within four months of bankruptcy, the "secured" creditor took possession of the securities. The Supreme Court held that the transfer was not a preference because the transferee creditor had an "equitable" right to possession more than four months before bankruptcy. In Bailey v. Baker Ice Machine Co., 239 U.S. 268, 36 S.Ct. 50, 60 L.Ed. 275 (1915), Carey v. Donohue, 240 U.S. 430, 36 S.Ct. 386, 60 L.Ed. 726 (1916), and Martin v. Commercial National Bank, 245 U.S. 513, 38 S.Ct. 176, 62 L. Ed. 441 (1918), the Court considered various kinds of transfers of property between a debtor and a creditor more than four months before bankruptcy, but which were recorded during the four-month period. In all these cases, the Supreme Court held that the transfers were not preferences as defined in Section 60 of the Bankruptcy Act.
Recognizing that it had failed in its efforts to protect general creditors against unrecorded liens, Congress completely rewrote Section 60 of the Bankruptcy Act in 1938. The approach of the Congress to the problem of "secret" liens was to postpone the effectiveness of a transfer until
"it became so far perfected that no bona fide purchaser from the debtor *604 and no creditor could thereafter have acquired any rights in the property so transferred superior to the rights of the transferee therein. * * *" See 3 Collier, Bankruptcy, supra, § 60.06, n.13.
The clear effect of this provision was to postpone the effectiveness of a transfer as against general creditors until valid notice was given under state law. Unfortunately, the 1938 version of Section 60 resulted unintentionally in undermining the status of certain kinds of secured credit, particularly the assignment of accounts receivable. See Corn Exchange National Bank & Trust Co., Philadelphia v. Klauder, 318 U.S. 434, 63 S.Ct. 679, 87 L.Ed. 884 (1943); In re Vardaman Shoe Co., 52 F.Supp. 562 (E.D.Mo.1943). Congress was not satisfied with the effect which its 1938 version of Section 60 had upon secured credit, so in 1950 Congress once again amended Section 60. This amendment put Section 60 in its present form. The House Report which accompanied the 1950 amendment states:
"* * * In 1938 the Bankruptcy Act was amended to obviate the effect of [the Sexton, Bailey, Carey and Martin cases described above], which were regarded with disfavor by the great majority. But in so doing, the authors of the amendment went further than was necessary, and it brought about results which they did not anticipate. The amendment placed the trustee in the position of an artificial bona fide purchaser, and, by so doing, unintentionally invalidated many types of liens acquired in good faith and for value, in normal and accepted business and financial relationships. * * *
"The resultant confusion has cast grave doubt upon the validity of normal business security. * * *" H.R. Rep.No. 1293, supra, 2 U.S.Code Cong. Service at 1986, 1987.
It is therefore clear that in adopting Section 60 as it now reads, Congress intended not only to invalidate "secret" liens, Congress also intended to give effect to legitimate forms of secured financing created in accordance with state law. The House Report clearly stated this latter purpose:
"* * * The present [1938] language of the act tends to impede and choke the flow of credit, principally to small-business men, and the object of the bill is to free its channels." H. R.Rep.No. 1293, supra, 2 U.S.Code Cong.Service at 1985.
It would be exceedingly ironic if language in a statute which was intended to facilitate secured financing were construed in a manner which discouraged such financing. Nothing in the language or purposes of Section 60 compels such a construction.
The facts of this case are plainly not within the evil which Congress was seeking to prevent in Section 60. The creditors of Grain Merchants had the notice of Union Bank's lien against accounts receivable required by the Indiana Uniform Commercial Code well before the four-month period and before the Union Bank last extended credit to Grain Merchants. The legitimate and reasonable expectations of the general creditors of Grain Merchants are in no way upset or frustrated by giving full effect to the security agreement which Grain Merchants executed with the Union Bank. On the other hand, if this security agreement is held to conflict with Section 60 of the Bankruptcy Act, then the trustee will be able to claim for the benefit of the general creditors assets which the general creditors never reasonably expected and could not expect to have available to satisfy their claims. Obviously, such a result would discourage the flow of secured credit and would therefore be contrary to an expressed aim of the Congress.
Regarding the accounts receivable which were created after September 20, 1966 as part of a stock of accounts receivable transferred when Union Bank filed its financing statement is not, as the trustee contends, a "fiction." From *605 a business standpoint, the most accurate view of the transaction is to regard the stock of accounts receivable together as an entity which was given as security for a new loan. The individual components of that entity may have changed, but that did not alter the essential character of the security given. A stock of accounts receivable is an essential tool of modern business. It is an asset used to generate income, just as plants and equipment are assets used to generate income. In modern finance, it is far more realistic to view the entire stock of accounts receivable together as a single asset subject to a single security interest than to view individual accounts as separate assets subject to separate security interests. In re Portland Newspaper Publishing Co., 271 F.Supp. 395 (D.Ore.1967). See Rosenberg v. Rudnick, 262 F.Supp. 635 (D.Mass.1967).
The court therefore concludes that if Section 60 is to be interpreted in a realistic manner and in the manner most consistent with the Congressional purpose in enacting it, the transfers of accounts receivable which came into existence after September 20, 1966, and which were transferred to the Union Bank pursuant to its security agreement with Grain Merchants executed in September of 1965, must be considered as part of a transfer of a stock of accounts receivable occurring when Union Bank filed its financing statement and, therefore, not as individual transfers on account of an antecedent debt.
The construction of Section 60 which the court adopts is a matter of federal law. This construction is consistent with the law of Indiana as expressed in Burns' Ind.Stat. § 19-9-108. Whether the concept of "transfer * * * on account of an antecedent debt" in Section 60 may be subject to interpretation or change by the states is a question which this court therefore need not consider.
For the reasons above stated, the court holds that the transfer to Union Bank of accounts receivable created after September 20, 1966 was not a preference, at least to the extent that the collections from accounts receivable may be applied in payment of the September 20, 1966 note. This note totaled $100,596.03. The referee permitted the Union Bank to retain $75,199.94 in collections from accounts receivable. The Union Bank may therefore retain at least an additional $25,396.09.
The remaining collections on accounts receivable which arose after September 20, 1966 totaled $27,045.40. Of this amount, the bank concedes that it must return $7,116.52, the amount by which its total collections from all sources exceeded its claims against the bankrupt. The bank seeks to apply the remainder, $19,928.88, in satisfaction of the two notes which Grain Merchants executed in favor of the bank in December of 1965. If, as the bank contends, the security agreement covering accounts receivable which was executed on September 17, 1965 provided additional security for the two loans made in December of 1965, then the bank may apply the proceeds from collections on accounts receivable in payment of these loans. However, if either or both of these loans were not secured by accounts receivable, the bank's appropriation of accounts receivable was a preference to the extent that proceeds were applied in payment of such loan or loans.
The order of the referee in bankruptcy directing the Union Bank to turn over to the trustee in bankruptcy of Grain Merchants the sum of $52,441.49, plus interest as provided in the referee's order, is set aside. This cause is remanded to the referee for a determination as to whether the notes executed by the bankrupt to the Union Bank in December of 1965 were secured by accounts receivable under the security agreement executed September 17, 1965 and for further proceedings in accordance with this opinion and with law.
In view of this disposition of Union Bank's petition for review, it is unnecessary to consider the bank's other assignments of error.