MIRACLE FEEDS, INC., Plaintiff-Respondent,

v.

ATTICA DAIRY FARM, a partnership,
Defendant,

ZIM'S CHEESE, INC., Garnishee Defendant,

COMMERCIAL & SAVINGS BANK OF
MONROE, Intervening Garnishee Defendant-
Appellant. †

Court of Appeals

*No. 84–2405. Submitted on briefs November 11, 1985.—
Decided February 13, 1986.*
(Also reported in 385 N.W.2d 208.)

† Petition to review pending. This petition was not decided at the time the volume went to press. Its disposition will be reported in a later volume.

For the intervening garnishee defendant-appellant the cause was submitted on the briefs of *Carlyle H. Whipple* and *Whipple Law Offices, S.C.* of Madison.

For the plaintiff-respondent the cause was submitted on the brief of *Dennis P. Maroney* and *Patrick T. McMahon* and *McMahon & Moroney, S.C.* of Milwaukee.

Before Gartzke, P.J., Dykman and Eich, JJ.

EICH, J.   Commercial & Savings Bank of Monroe appeals from a summary judgment awarding Miracle Feeds, Inc., the proceeds of several garnisheed milk checks payable to the Attica Dairy Farm. The garnishment action was brought by Miracle against Attica as

principal defendant and Zim's Cheese as garnishee defendant. Zim's Cheese was holding several milk checks payable to Attica, all of which were "caught" by the garnishment. The bank, another of Attica's creditors, intervened in the action, asserting a claim against the captured funds for which it claimed a prior perfected security interest.

The issue is whether the trial court erred in concluding that the bank had waived its security interest by failing to "police" the debt—failing to actively pursue or exercise its rights to Attica's milk checks after default. We conclude that the bank did not waive or abandon its interest in the checks, and we therefore reverse.

In exchange for advances from the bank exceeding one million dollars, Attica executed a UCC Farm Security Agreement which gave the bank a security interest in "[a]ll accounts and contract rights . . . arising from . . . Milk Sales, which [Attica] hereby assigns to [the bank]." The bank recorded the agreement, together with various supplemental financing statements and a general assignment of milk receipts. As a result, the bank had a perfected security interest in all of Attica's milk proceeds. It is conceded that the bank's interest predated the lien asserted by Miracle in the garnishment action.

In early 1983, Attica was in serious financial trouble. The bank became concerned about the devaluation of assets often associated with foreclosure or bankruptcy proceedings and, together with several other creditors, negotiated a "Creditor Arrangement" with Attica. Among other things, the agreement established a repayment schedule which allowed Attica to defer payments on the bank's debt until December 20, 1983,

at which time Attica was to begin making payments of at least $800 per month. The $800 was intended to be a token payment consistent with Attica's reduced cash flow.[1] Attica failed to make any of the payments. However, notwithstanding the assignment of milk checks, the bank did not enforce its agreements with Attica but instead placed the milk sale proceeds in an account managed by Attica's principal owners.

When Miracle, who was not a party to the creditor agreement, commenced the garnishment action, the bank intervened and all parties moved for summary judgment. The trial court granted Miracle's motion, concluding that the bank had relinquished its rights to the proceeds by failing to enforce its lien or "police" Attica's debt, stating that "[t]o rule otherwise . . . would be to render the garnishment law totally unenforceable for all practical purposes, a nullity in almost any type of situation." We disagree.[2]

Miracle's garnishment action does not give it any greater right to the milk proceeds than Attica itself possessed on the date the action was filed. In effect, the garnishment was "an action by [Attica] in [Miracle's] name against the garnishee, the purpose of which is to subrogate the plaintiff to the rights of the defendant

---

[1] To preserve the collateral, several other expenses had to be paid first, including taxes, livestock maintenance and land contract payments.

[2] In summary judgment cases, we follow the same analysis as the trial court. That procedure, discussed in *In re Cherokee Park Plat,* 113 Wis.2d 112, 115–16, 334 N.W.2d 580, 582–83 (Ct. App. 1983), need not be repeated here. The bank's claim to the funds and Miracle's defense to that claim are adequately raised in the pleadings. Affidavits filed by the parties disclose no factual disputes, and both agree that the only issue is Miracle's legal right to the milk check proceeds.

against the garnishee." *Commercial Inv. Trust, Inc. v. Wm. Frankfurth H. Co.,* 179 Wis. 21, 24, 190 N.W. 1004, 1005 (1922). Miracle merely stands in Attica's shoes, and since Attica had assigned all milk sale proceeds to the bank long before Miracle's garnishment, Miracle had no present right to them. *Kramer v. Burlage,* 234 Wis. 538, 541, 291 N.W. 766, 768 (1940); *Middleton Lumber & Fuel Co. v. Kosanke,* 216 Wis. 90, 93, 256 N.W. 633, 634 (1934).

Miracle argues, however, that the trial court was correct in holding that the bank relinquished its right to assert its security interest because several milk checks, which ostensibly were assigned to the bank, were not held, but rather deposited in an account controlled by Attica. Wisconsin law does not support the assertion. The bank may grant Attica unfettered control over the secured proceeds—it can wholly refrain from "policing" the debt—without losing its security interest. Section 409.205, Stats., provides that:

> A security interest is not invalid or fraudulent against creditors by reason of liberty in the debtor to use, commingle or dispose of all or part of the collateral (including returned or repossessed goods) or to collect or compromise accounts or chattel paper, or to accept the return of goods or make repossessions, or to use, commingle or dispose of proceeds, or by reason of the failure of the secured party to require the debtor to account for proceeds or replace collateral.

The statute was created in 1961 as part of Wisconsin's adoption of the Uniform Commercial Code. The Legislative Council Report accompanying the act sum-

marized the changes made by sec. 409.205, Stats., as follows:

> [B]roader application [is given] to the principle . . . that granting the debtor certain rights with respect to collateral does not in itself make the security interest fraudulent or void against creditors; specifically, this will abrogate the rule announced in several Wisconsin cases that a mortgage on stock in trade is void as to creditors unless the mortgagee applies the proceeds to payment of the mortgage debt or to acquisition of replacement stock.

In addition, the official UCC comment to sec. 409.205 (UCC sec. 9.205) states:

> [A] security interest is not invalid or fraudulent by reason of liberty in the debtor to dispose of the collateral without being required to account for proceeds or substitute new collateral. [The section] repeals the rule of *Benedict v. Ratner,* 268 U.S. 353 (1925) [the substance of which was to require "policing" of collateral], and other cases which held such arrangements void as a matter of law because the debtor was given unfettered dominion or control over the collateral.

We have found only one case construing sec. 409.205, Stats. In *Burlington Nat. Bank v. Strauss,* 50 Wis.2d 270, 184 N.W.2d 122 (1971), the plaintiff bank had a perfected security interest in a farmer's herd of cattle. The bank permitted the farmer to buy, sell, and replace cows at his discretion, and another creditor argued that the bank's acquiescence in the farmer's exercise of control over the herd constituted a waiver of its lien. The court held, however, that while there may well have been a waiver under the pre-UCC law, under the present law (sec. 409.205), "a debtor is now able

to commingle his property and use it to his best interest, and the acquiescence of the secured creditor under an after acquired clause in such a program by the debtor does not invalidate the security interest of the creditor." *Id.* at 274, 184 N.W.2d at 124. *See also* Helstad, Wisconsin UCC Handbook, sec. 17.12(3).

While we deal here with negotiable instruments, not cattle, the Burlington Bank's lien in *Strauss,* like that of the Commercial Bank, arose from a standard farm security agreement containing an after-acquired property clause, and it failed to "police" the debtor's ongoing transactions involving the collateral. As in *Strauss,* we conclude that the Commercial Bank has not waived its rights, and its security interest in the milk receipts takes precedence over Miracle's judgment lien. Sections 409.301(1)(a) and (b) and 409.312 Stats.

■ Miracle next argues that, because "there has been no default," the bank cannot assert any rights to the captured funds. It is true that under Wisconsin law a secured creditor may not enforce rights and remedies in the collateral until the debtor defaults. This does not mean, however, that the debtor must default before a secured party has an interest in the collateral sufficient to defeat other creditors' claims. The bank's rights in relation to others claiming an interest in the collateral are not determined by the debtor's default or the bank's recognition of, or action on, that default. Rather, the existence and enforceability of those rights depend upon the bank's compliance with the provisions of ch. 409 governing the perfection and priority of security interests.

> The priority of a perfected security interest is not affected by the fact that a secured party, in order to assist the debtor and to enhance the likelihood of satisfaction of any indebtedness, agreed not to declare the debtor in default. A secured creditor does not owe any duty to those holding subordinate interests to proceed to enforce his remedies. To hold otherwise would place an undue burden, not imposed under the UCC, upon debtors and creditors alike. *National Accept. Co. of America v. Virginia,* 491 F. Supp. 1269, 1276 (E.D. Va. 1980) (citations omitted).

Finally, Miracle argues that because Attica's "default" relates only to the monthly payments of $800 due the bank under the creditor agreement, all garnisheed funds in excess of that amount are "surplus" and should be paid over to Miracle. Surplus, however, is defined as "that interest of [the debtor] over and above the amount necessary to pay [the] debt secured [by the collateral]." *Kiel Wooden Ware Co. v. Raeder,* 242 Wis. 62, 64, 7 N.W.2d 414, 415 (1943). Miracle has confused two separate issues—the debt incurred and the repayment of that debt. The milk check proceeds secured a debt in excess of one million dollars. The $800 is merely a minimum periodic repayment figure; it is not the measure of Attica's debt to the bank.

*By the Court.*—Judgment reversed and cause remanded with directions to grant appellant's motion for summary judgment.

DYKMAN, J. *(concurring).* One of the purposes of the Uniform Commercial Code is to make uniform the law among the states adopting the Code. Section 401.102(2)(c), Stats. Uniform codes ought be inter-

preted uniformly by following decisions in other jurisdictions. *House of Stainless v. Marshall & Ilsley Bank,* 75 Wis.2d 264, 274, 249 N.W.2d 561, 567 (1977). The Code mandate of uniformity makes the decisions of other states "more than mere persuasive authority." Anderson, *Uniform Commercial Code* at 13, sec. 1-102:8.-Uniformity (2d Ed. 1970), quoting *A.J. Armstrong, Inc. v. Janburt Embroidery Corp.,* 234 A.2d 737, 744 (N.J. Super. Ct. Law Div. 1967). Accordingly, when Wisconsin cases do not answer a question arising under the Uniform Commercial Code, we should examine other courts' decisions to be sure our result is consistent with theirs.

In Illinois, Ill. Rev. Stat. 1979, ch. 26, par. 9–205, a provision identical to sec. 409.205, Stats., has been interpreted to permit a debtor to use proceeds of accounts receivable with no obligation on the part of the creditor to police the use of the resulting bank account balances. In *Farns Associates, Inc. v. South Side Bank,* 417 N.E.2d 818, 823 (Ill. App. Ct. 1981), the court said:

> [ch. 26, par. 9–205] eliminates any requirement upon the creditor to police strictly the collateral and the proceeds in the hands of the debtor. Putting such a duty on a secured creditor would severely undercut significant values of certainty, efficiency and reliance which are at the heart of the Codal emphasis on public filing. [Citations omitted.]

An interpretation of New Jersey law is similar. In *In Re United Thrift Stores, Inc.,* 242 F.Supp. 714, 717 (D.N.J. 1965), *aff'd,* 363 F.2d 11 (3rd Cir. 1966), the court said:

> However, the Code contains no requirements with regard to method of payment affecting the validity

of a security interest. See N.J.S.A. § 12A:9-203 (1)(b). In fact, N.J.S.A. § 12A:9-205 provides that a "security interest is not invalid . . . by reason of the failure of the secured party to require the debtor to account for proceeds or replace collateral." *Thus, under the Code, payment is not relevant to the question of validity of a security interest, and there is no requirement of "policing" of collateral by the secured party.* [Emphasis added.]

In *Community Bank v. Jones,* 566 P.2d 470, 484-85 (Or. 1977), the Oregon Supreme Court said:

> One of the purposes of the Code is to facilitate inventory financing by relaxing pre-Code rules requiring close supervision of a debtor's inventory by his secured creditor. Pre-Code decisions to the contrary are incompatible with modern high volume sales and accompanying quick inventory turnovers. See Lakin & Berger, *A Guide to Secured Transactions* 67-68, 107-110 (1970). Preservation of Code policy in this area forecloses the application of equitable defenses based upon plaintiff's alleged failure to supervise the inventory, or to supervise only those portions of the inventory upon which it held trust receipts. [Footnote omitted.]

An interpretation of Indiana law is consistent with the preceding cases:

> [A] security interest . . . in . . . accounts receivable . . . . [i]s specifically authorized in Burns' Ind.Stat. § 19-9-204(3), which provides that, with exceptions not relevant here, ". . . a security agreement may provide that collateral, whenever acquired, shall secure all obligations covered by the security agreement." This provision from the Uniform Commercial Code validates what is sometimes called a "floating lien." Burns' Ind.Stat. § 19-9-205

[identical to sec. 409.205, Stats.] provides that a security interest may be valid notwithstanding power in the debtor to collect and apply the proceeds of accounts receivable without accounting to the secured party. Thus, the Uniform Commercial Code as adopted in Indiana provides for financing arrangements whereby a debtor may transfer a security interest in a stock of accounts receivable, but retain possession of the accounts, collect them, and create new ones. The security interest "floats" over the accounts receivable in existence at any given moment.

*In re Grain Merchants of Indiana, Inc.*, 286 F.Supp. 597, 601 (N.D. Ind. 1968), *aff'd,* 408 F.2d 209 (7th Cir. 1969), *cert. denied,* 396 U.S. 827 (1969).

The heart of Article 9 of the Uniform Commercial Code is the filing system. A prospective secured creditor is required to ascertain whether prior secured creditors exist. A second-in-time secured creditor is given little protection under the Code, with limited exceptions, because it is easy to determine whether other creditors claim an interest in a debtor's property. Here, Miracle Feeds would have discovered the bank's floating lien covering Attica's bank deposits had it inquired. It could then have made arrangements for security, risked an unsecured advance, or refused to advance credit. Having ignored the warnings given by a filed financing statement, Miracle Feeds cannot now complain that it is unable to reach Attica's assets because of the bank's security agreement covering those assets.