**SAMPSON INVESTMENTS, Plaintiff,**

v.

**Harold SAMPSON, et al., Defendants.**

No. 98–C–0463.

United States District Court, E.D. Wisconsin.

Aug. 22, 2000.

Scott R. Halloin, Paul S. Medved, Narciso L. Aleman, Mallery & Zimmerman, Milwaukee, WI, for Plaintiff.

Joseph C. Niebler, Niebler & Muren, Brookfield, WI, for Harold Sampson & Judith Sampson.

David A. Lange, Wisconsin Department of Revenue, Madison, WI, for Wisc. Dept. of Revenue.

Robert H. Friebert, Lawrence J. Glusman, Friebert Finerty & St. John, Milwaukee, WI, for Heritage Investment Co.

Mark L. Metz, Reinhart Boerner Van Deuren, Norris & Rieselbach, Milwaukee, WI, for Norwest Bank Wisconsin.

Rachel I. Wollitzer, United States Department of Justice, Tax Division, Washington, DC, for U.S.

K Thor Lundgren, Donald A. Daugherty, Jr., Michael Best & Friedrich, Milwaukee, WI, for NationsBank, Marshall & Ilsley Bank.

James J. Jacobson, Mark T. McNabb, L. John Ratzel, Jacobson & Ratzel, Brookfield, WI, Amy S. Rubin, Ruden McClosky Smith Schuster & Russell, West Palm Beach, FL, for First Union Nat. Bank of Florida.

James L. Adashek, William H Harbeck, Quarles & Brady, Milwaukee, WI, for Bank One Wisconsin.

## DECISION AND ORDER

RANDA, District Judge.

This matter comes before the Court on competing motions for summary judgment by the United States of America ("United States") and Heritage Investment Company, Inc. ("Heritage"). These two defendants are the sole claimants to the interpleader fund at issue in this case (the "Fund"), which consists of $765,782 deposited by the plaintiff, Sampson Investments ("Sampson Investments"). The Court has jurisdiction pursuant to 28 U.S.C. § 1335 and venue is proper in this district under 28 U.S.C. § 1391. For the reasons set forth below, the Court grants summary judgment in favor of the United States[1] and against Heritage and dismisses the plaintiff's interpleader complaint. In light of these rulings, the Court also dismisses the various supplemental or "pendent" state law claims that have been asserted in this action.

## BACKGROUND

Defendant Harold Sampson and his wife, Judith Sampson, were partners in Sampson Investments, a Wisconsin general partnership. Complaint, ¶¶ 1–3. In the 1990's, Harold Sampson entered into a number of financial transactions using as collateral his one-half share in Sampson Investments.

### A. Heritage's Security Interests

On February 8, 1990, Sampson executed and delivered to Heritage a Collateral Pledge Agreement (hereafter the "Heritage Agreement") granting Heritage a security interest in his one-half interest in the Partnership. Exhibits in Support of United States' Motion for Partial Summary Judgment, Exhibit 3.[2] The Heritage Agreement states that:

---

1. In its interpleader complaint, Sampson Investments named as defendants numerous entities that might lay claim to the Fund, including the Internal Revenue Service ("IRS"). The Government, in an unopposed motion, seeks to substitute "the United States" for the IRS as defendant. The motion is hereby granted. While agencies such as the IRS are not "suable" entities, see *Blackmar v. Guerre*, 342 U.S. 512, 514, 72 S.Ct. 410, 96 L.Ed. 534 (1952), the United States is a proper defendant. Where relief, if granted, would result in a judgment that would expend itself on the public treasury or restrain the Government from action or interfere with public administration, the suit constitutes an action against the United States. *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963).

2. Henceforth, this collection of documentary material will be referred to as "U.S.," fol-

In consideration of any financial accommodation at any time granted by Heritage Investment Company, Inc. ("Bank") to Harold Sampson ("Borrower"), each of the undersigned ("Debtor") grants to Bank a security interest in all property of any kind now or hereafter in the possession or control of the bank for collateral purposes in which Debtor has an ownership interest and in the following described property: *one half interest in Sampson Investments, a Wisconsin general partnership* and 1000 shares of Digi–Net, Inc., a Wisconsin Corporation . . . .

*Id.* (emphasis added.) On February 22, 1990, Heritage filed with the Wisconsin Secretary of State a financing statement pertaining to its security agreement with Sampson. U.S. Exhibit 4. Heritage refiled its financing statement on June 12, 1997.[3] U.S. Exhibit 5.

### B. *Bank One's Security Interests*

On April 5, 1990, Sampson executed and delivered a Selective Business Security Agreement to Bank One ("Bank One's SBSA"), granting Bank One a security interest in Sampson Investments. U.S. Exhibits 9 & 10. The Bank One SBSA provides in relevant part:

The undersigned ("Debtor," whether one or more) grants Bank One, Milwaukee, NA ("Bank") a security interest in property, wherever located, checked in section 2 ("Collateral") to secure his Obligations to Lender.

Section 2(b): Specific Collateral: If checked here, the following described accounts, contract rights, chattel paper, equipment, general intangibles, instruments, documents of title and inventory now owned or hereafter acquired by Debtor (or by Debtor with spouse): *All Debtor's right, title and interest in and*

to Sampson Investments, a Wisconsin general partnership, including without limitation all right to profits, income, payments and distributions arising therefrom.

*Id.* (emphasis added.) On April 13, 1990, Bank One filed a financing statement pertaining to its security agreement with Sampson. U.S. Exhibit 11. On December 28, 1992, Sampson and Bank One executed an Amended and Restated Agreement. U.S. Exhibit 12. Then, on March 28, 1995, Bank One and Sampson executed a Second Amended and Restated Agreement ("Second Amended Bank One Agreement"), further restructuring their relationship. U.S. Exhibit 13. The Second Amended Bank One Agreement provides in relevant part:

Except for such advances (the "Permitted Advances") made to permit Sampson:

(A) to pay his income tax liability (after application of any loss carry-forwards to the extent they are available after any reduction thereof pursuant to § 108 of the Internal Revenue Code) arising from the operations of Sampson Investments or from its distributions to Sampson as described above;

\*　　\*　　\*　　\*　　\*　　\*

Sampson shall not receive any advances, distributions (in cash or other property) or other payments or transfers arising from his partnership interest in Sampson Investments until the full amount of Personal Liability has been paid in full.

*Id.* On October 20, 1995, Bank One filed a financing statement pertaining to the Second Amended Bank One Agreement. U.S. Exhibit 14.

### C. *The Participants' Security Interests*

On December 5, 1991, Sampson executed and delivered a Selective Business Se-

lowed by the exhibit number, *e.g.,* U.S. Exhibit 3.

**3.** On November 27, 1997, Sampson entered into another agreement with Heritage wherein he granted Heritage a "one half interest in

Sampson Investments, a Wisconsin general partnership." Heritage filed a financing statement pertaining to this agreement on June 12, 1997.

curity Agreement granting a security interest in Sampson Investments to a pool of various creditors (the "Participants"). U.S. Exhibit 15. This document (the "Participants' SBSA") provides in relevant part that:

> Subject to the prior rights of Bank One, Milwaukee, N.A. ("Bank One") under the Bank One Selective Business Security Agreement executed contemporaneously herewith by Debtor in favor of Bank One (the "Bank One Selective Business Security Agreement") and the Preexisting Liens [specifically including the "prior security interests in Debtor's partnership interest in Sampson Investments granted in favor of Heritage Investment, Inc." (UCC Financing No. 1112904, filed with the Wisconsin Secretary of State on February 22, 1990) ] the Participants shall share in the Collateral ... *pro rata* in accordance with the ratio that the amount of each Participant's Debt ... from Debtor as of the date of this Agreement bears to the aggregate Debt from Debtor to all Participants.

*Id.* Like the Second Amended Bank One Agreement, the Participants' SBSA contained a provision regarding the Sampsons' ability to pay taxes:

> All distributions, payments or proceeds received by Debtor resulting from or arising in connection with Debtor's interests in the Collateral ... shall be subject to the security interests granted hereunder and shall forthwith be delivered to Participants *pro rata* ... *provided, however,* that Debtor shall be entitled to first pay from such partnership distributions or payments all taxes resulting or arising from such distribution or payments otherwise resulting from or arising from his ownership of such partnership interests.

*Id.* On November 25, 1991, the Participants filed a financing statement regarding their security agreement with Sampson. U.S. Exhibit 16. The Participants re-filed

their financing statement on March 8, 1993, and, on January 23, 1998, filed a continuation statement. U.S. Exhibit 17.

### D. The United States' Tax Lien

On July 19, 1999, the IRS assessed against Harold and Judith Sampson 1997 income taxes in the amount of $765,199. U.S. Exhibit 1. On August 25, 1999, the IRS filed a Notice of Federal Tax Lien "in favor of the United States on all property and rights to property belonging to [Harold and Judith Sampson] for the amount of these taxes, and additional penalties, interest, and costs that may accrue" in the amount of $844,228.01 (including statutory additions to the 1997 assessed amount). U.S. Exhibit 2.

### E. Procedural History

At the time Sampson Investments filed its interpleader complaint, it was operating pursuant to the Second Amended and Restated Partnership Agreement of Sampson Investments (the "Partnership Agreement"). Declaration of Rachel I. Wollitzer ("Wollitzer Decl."), Exhibit A; Complaint, ¶ 22. Paragraph 6.1 of the Partnership Agreement authorized distributions to the partners for the payment of federal and state income taxes incurred on account of the profits of Sampson Investments. *Id.*[4] Pursuant to this provision, Sampson Investments wanted to make a distribution to Sampson in the amount of his estimated federal and state income tax burden of 1997, or $765,782. Complaint, ¶¶ 23–25. However, Sampson Investments recognized that Sampson's various creditors might claim entitlement to the distribution. *Id.,* ¶ 26. Accordingly, on May 20, 1998, Sampson Investments deposited $765,782 with the Clerk of this Court and filed its one-count interpleader complaint, pursuant to 28 U.S.C. § 1335 and Federal Rule of Civil Procedure 22.

The complaint names eighteen defendants (including Sampson, the IRS, and a

---

4. Because a partnership is a so-called "pass-through entity," its profits are reportable as income on the partners' individual income tax returns. *See* 26 U.S.C. § 701.

number of Sampson's creditors) that Sampson Investments believed could assert claims to the Fund. Complaint, ¶¶ 2–19. While most of these defendants have not filed appearances or answers, several (including Heritage, Bank One, and NationsBank) have filed counterclaims and cross-claims seeking relief well beyond the limited scope of the original one-count complaint. However, the United States and Heritage are the only defendants that claim entitlement to the Fund.[5]

Heritage asserts that its security interest was perfected on June 12, 1997, and is first-in-time (and thus first-in-right) relative to the United States' August 25, 1999 interest. *See United States ex rel. Internal Revenue Serv. v. McDermott*, 507 U.S. 447, 449, 113 S.Ct. 1526, 123 L.Ed.2d 128 (1993). The United States does not dispute that Heritage's security interest was perfected prior to its tax lien; instead, the Government argues that the security agreements of Bank One and the Participants control, and that these instruments specifically allow for Sampson to receive the tax distribution (*i.e.*, the Fund) so that he may satisfy the Government's tax lien.

## ANALYSIS

### A. *Summary Judgment Standard*

The standards governing motions for summary judgment are well established. Pursuant to Rule 56(c):

> summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(citing Fed.R.Civ.P. 56(c)).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.*, at 327, 106 S.Ct. 2548. Summary judgment "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *United Food and Commercial Workers Union Local No. 88 v. Middendorf Meat Co.*, 794 F.Supp. 328, 330 (E.D.Mo.1992). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While a *material* fact is one that is "outcome determinative under the governing law," *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir. 1990), a *genuine* issue as to that material fact is raised only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

The question whether a material issue of fact is *genuine* necessarily requires "some quantitative determination of sufficiency of the evidence." Childress, *A New Era for Summary Judgments: Re-*

---

**5.** Although named as a defendant, the Wisconsin Department of Revenue has not filed an appearance or made a claim to the Fund. NationsBank has filed responsive motions to contest certain proposed findings of fact that

NationsBank believes may prejudice its ability to pursue various cross-claims. However, NationsBank does not assert that it is entitled to the Interpleader Fund.

cent Shifts at the Supreme Court, 116 F.R.D. 183, 186 (1987). "Of course, a court still cannot resolve factual disputes that could go to a jury at trial, . . . [b]ut no longer need the trial court leave every sufficiency issue for trial or a later directed verdict motion." Id. "A district judge faced with [a summary judgment motion] must decide . . . whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict. If not, the motion should be granted and the case dismissed." Palucki v. Sears, Roebuck & Co., 879 F.2d 1568, 1572–73 (7th Cir.1989) (citations omitted). Thus, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[A] party must produce 'specific facts showing that there remains a genuine issue for trial' and evidence 'significantly probative' as to any [material] fact claimed to be disputed." Branson v. Price River Coal Co., 853 F.2d 768, 771–72 (10th Cir.1988). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249–50, 106 S.Ct. 2505.

## B. Priority and Scope of Security Interests

As the Government concedes, its tax lien is subject to any lien that was perfected before the filing of its Notice of Federal Tax Lien on August 25, 1999. See McDermott, 507 U.S. at 449, 113 S.Ct. 1526 (discussing 26 U.S.C. § 6323). Bank One, Participants, and Heritage all stand in line before the Government, having perfected their interests well before the United States. However, the question of which of these secured parties has the most senior lien is significant because, while the Bank One and Participants agreements expressly authorize distributions for the payment of taxes, the Heritage agreement does not. Thus, if either Bank One or Participants has a security interest that takes precedence over Heritage's, the tax distribution (i.e., the Fund) vests in Sampson and becomes subject to the Government's tax lien on Sampson's property.[6] Conversely, if Heritage stands first in line, then Heritage is arguably entitled to the Fund.

■■■ A security interest is only effective for five years. W.S.A. § 409.403(2). Heritage filed its original financing statement on February 22, 1990. Heritage did not refile within five years; indeed, it did not refile until June 12, 1997. Meanwhile, on October 20, 1995, Bank One had refiled (after also allowing the five year period to lapse). Participants re-filed on March 8, 1993, within five years of its original financing statement, and again January 23, 1998. See U.S. Exhibit 15. Thus, as a matter of law, the liens of Bank One and Participants are prior to the lien of Heritage.[7]

■■ Having determined the priority of the competing liens, the only remaining question concerns the scope of the security interests of Bank One and Participants. By specifically allowing for tax distributions, is it possible that these agreements did not create a security interest in such distributions? If so, then summary judgment in favor of the Government would be inappropriate (though it would not necessarily follow that Heritage is entitled to summary judgment). For several reasons, the Court does not believe that the provisions allowing for tax distributions place such distributions beyond the reach

6. Neither Bank One nor Participants claims entitlement to the Fund.

7. Certain agreements between Sampson and Heritage created a security interest in Sampson's tangible personal property, see U.S. Exhibits 6 & 7, but these are not discussed

because a partner's right to a distribution from a partnership is a "general intangible" under the U.C.C. See In re Mintz, 192 B.R. 313, 316–18 (Bankr.D.Mass.1996); W.S.A. § 409.106.

of the lienholder. There is no express language to that effect in the relevant agreements. To the contrary, the collateral for each of the agreements is very broadly defined. The Bank One security agreement names, as collateral, "*[a]ll* Debtor's rights, title and interest in and to Sampson Investments, . . . including without limitation all right to profits, income, payments and *distributions* arising therefrom." U.S. Exhibit 9 (emphasis added). Likewise, collateral for the Participants security agreement consists of "*[a]ll* of the Debtor's right, title and interest . . . in and to [Sampson Investments], including without limitation all right to receive profits, income, payments, *distributions* and proceeds arising therefrom." U.S. Exhibit 15 (emphasis added). These descriptions are not "ambigu[ous] or confusing," *Chase Manhattan Bank v. J & L General Contractors,* 832 S.W.2d 204, 211 (Tex.App. 1992), nor do the provisions for tax distributions create any ambiguity.[8] The tax distribution provisions, in the opinion of the Court, were a practical allowance by Bank One and Participants and not a limitation on the scope of their security interests in the collateral. Stated another way, the breadth of the security interests means that Bank One and Participants could have asserted valid claims to the Fund, had they chosen to do so. Because they have not, the tax distribution vests in Sampson and is subject to the Government's tax lien.[9]

The Uniform Commercial Code ("U.C.C."), as adopted by Wisconsin, reinforces the Court's conclusion with respect to the scope of the security interests created in favor of Bank One and Participants. The U.C.C. provides that "[a] security interest is not invalid . . . against creditors by reason of liberty in the debtor to use, commingle, or dispose of all or part of the collateral." W.S.A. § 409.205 ("U.C.C. Section 205"). This principle has been applied in a variety of contexts, but never, as far as the Court is aware, in a case involving a security interest in a tax distribution from a partnership. *See Ellefson v. Centech Corp.,* 606 N.W.2d 324, 335 (Iowa 2000); *In re Collated Products Corp.,* 121 B.R. 195, 202 (D.Del.1990); *Miracle Feeds, Inc. v. Attica Dairy Farm,* 129 Wis.2d 377, 385 N.W.2d 208, 210 (1986); *Rencsok v. Rencsok,* 46 Mich.App. 250, 207 N.W.2d 910, 913 (1973). Heritage argues that U.C.C. Section 205 applies only to a "debtor's right to dispose of inventory or accounts receivable in the normal course of its business." Heritage Opposition Brief, p. 7. However, since Heritage has offered no support for such a limitation, the Court concludes that the general principle of Section 205 is relevant here. The Court grants summary judgment in favor of the United States in part because it finds, as a matter of law, that the validity of a security interest is not impaired by the secured party's allowance of a partnership distribution for the payment of income taxes.[10]

### C. *Supplemental Jurisdiction*

██ "The general rule is that when as here the federal claim drops out before trial (here way before trial), the federal

---

8. The U.C.C. provides that for purposes of describing collateral "any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described." W.S.A. § 409.110.

9. Because the security interests of Bank One and Participants are senior to that of Heritage, the scope of Heritage's security interest is irrelevant, as is the fact that the Heritage agreement preceded the Government's tax lien. *See* discussion *supra.*

10. The Court also rejects Heritage's argument that the security interests of Bank One and Participants have terminated pursuant to W.S.A. § 409.306(2), which corresponds with Section 306(2) of the U.C.C. ("Section 306"). This Section merely provides that a "security interest continues in collateral notwithstanding sale, exchange or other disposition unless the disposition was authorized by the secured party . . . ." *Id.* Thus, the security interests of Bank One and Participants will terminate when Sampson has actually satisfied his obligations to the Government, but not before.

district court should relinquish jurisdiction over the supplemental claim[s]." *Van Harken v. City of Chicago,* 103 F.3d 1346, 1354 (7th Cir.), *cert. denied,* 520 U.S. 1241, 117 S.Ct. 1846, 137 L.Ed.2d 1049 (1997). The Court's original jurisdiction over this matter was based on the federal interpleader statute. Absent that "jurisdictional handle," the pendent state law claims in this action are no longer properly before the Court, and they are dismissed. *Id.* In other words, the Court grants Heritage's contingent motion to dismiss, though not because it agrees with Heritage concerning the proper disposition of the Fund.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Heritage's motion for partial summary judgment is DENIED;

2. The United States' motion for partial summary judgment is GRANTED; and

3. The supplemental state-law claims asserted in this action are DISMISSED.

SO ORDERED,