**Fred ALLOWAY, Jr., d/b/a Morganfield Lumber Co., and Fred Alloway, Appellant,**

**v.**

**Henry L. STUART et al., Appellees.**

Court of Appeals of Kentucky.

Dec. 11, 1964.

J. D. Ruark, Morganfield, for appellant.

James Holloran, Sturgis, for Henry L. Stuart.

Wathen & Wesley, Morganfield, Max Sigoloff, St. Louis, Mo., for Paul Schneider.

Damon A. Vaughn, Dixon, for George B. Vaughn.

MOREMEN, Judge.

This appeal involves a determination of priority of liens on certain personal property. The specific question is whether or not the lien of appellee, Paul J. Schneider, was prior to the lien of appellant, Fred Alloway, Jr. Appellant insists that appellee failed to comply with KRS 355.9–402, a section of the Uniform Commercial Code. The circuit court decided that Schneider's lien was superior to that of appellant, Fred Alloway, Jr.

In January 1962, Schneider sold certain bowling alley equipment to appellee, Henry L. Stuart. Stuart and his wife executed a chattel mortgage to appellee Schneider on the property sold in order to secure the payment of the purchase price, and in addition, a loan of money. The mortgage was filed for record on January 31, 1962.

On April 24, 1962, another chattel mortgage was executed by the Stuarts to Schneider under similar circumstances and this mortgage was properly filed for record on May 28, 1962.

Between January 21, 1962 and June 25, 1962, Stuart became indebted also to appellant, Fred Alloway, Jr., who did business as Morganfield Lumber Co., for lumber and materials furnished.

On June 26, 1962, Alloway filed an action in the Union Circuit Court against Stuart and caused an attachment to be issued against the bowling alley equipment belonging to Stuart.

On July 28, 1962, judgment was given against Stuart, and appellant, Fred Alloway, Jr. was awarded a lien against the bowling alley equipment by reason of the levy of the attachment.

On July 15, 1963, appellant filed an amended complaint and alleged that appellee Schneider was asserting an interest in the property against which he had been awarded a lien and requested that Schneider be required to answer. Schneider answered and set up his mortgage lien.

It is the contention of appellant, Fred Alloway, Jr., that under KRS 355.9–402, Schneider's chattel mortgages are defective because they were not signed by the secured party and therefore the attachment lien has priority. At that time subsection (1) of KRS 355.9–402 read:

"A financing statement is sufficient if it is signed by the debtor and the secured party, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor and contains a statement indicating the types, or describing the items, of collateral. A financing statement may be filed before a security agreement is made or a security interest otherwise attaches. When the financing statement covers crops growing or to be grown or goods which are or are to become fixtures, the statement must also contain a description of the real estate concerned. A copy of the security agreement is sufficient as a financing statement if it contains the above information and is signed by both parties."

It will be noted that the first sentence of the above quoted section states that a financing statement is sufficient if, among other things, it is signed by the debtor and the secured party, and the last sentence states that a security agreement is sufficient as the financing statement if it contains certain information and is signed by both parties. The mortgages here were signed only by the debtor, and the secured parties did not sign.

Subsection (6) of KRS 355.9–402 reads:

"A financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading."

In Lincoln Bank and Trust Company v. James F. Queenan, Ky., 344 S.W.2d 383, this Court, in a general discussion of the new uniform commercial code, pointed out that a non-possessory security interest created by a written agreement may be perfected by recording a public notice or financing statement. It was said:

"This notice, or financing statement, is a paper separate and apart from the security agreement itself, although a copy of the agreement may suffice as the financing statement if it is signed by both parties and meets the other requirements of § 9–402(1)."

Although we stated in that general discussion that the financing statement must be signed by both parties, the precise question was not presented by the facts of that case. We are now presented with the specific question as to whether the security agreement, which was filed as a financing statement, is sufficient even though it lacks the signature of the creditors. As was pointed out in the Queenan case, the financing statement merely serves notice of, and warning to, third parties that the creditor has some interest in the property which is in the physical possession of another. By it he serves notice that he has, or will have, a lien on the property. In fact, a chattel mortgage is more specific and detailed as to the description of the property, amount of money, interest and other details, than is required by a financing statement. Here the security agreement was used as a financing statement and contained an exact description of the security interest between the immediate parties to the chattel mortgage and we believe that it gave due notice as to third persons even though the mortgagee did not sign the instrument.

It was said in an article by Whiteside & Lewis, 50 Ky.L.J. 61, that the "financing statement places creditors upon notice that the debtor has given, or in the future may give a security interest in specific assets, leaving the details to further inquiry."

■ Certainly no potential creditor could fail to understand Stuart's position as debtor, in view of the detailed nature of the chattel mortgage filed. Further inquiry would disclose the exact amount of the unpaid balance. We believe substantial compliance was had (under subsection (6) of KRS 355.9–402) even though the creditor did not sign the instrument. The failure to sign could not have seriously misled anyone.

■ KRS 355.1–102 provides that the Commercial Code be liberally construed and applied to promote its underlying purposes and policies, among them being: "to permit the continued expansion of commercial practices through custom, usage and agreement of the parties."

It is difficult to recall a legal instrument that has deeper roots in the custom and usage of commerce than a mortgage. For many years people have protected non-possessory interests by its use. The transition from the use of mortgages to the instruments described in the Commercial Code was so sudden and comprehensive that few businessmen or, for that matter, lawyers became immediately familiar with all requirements. A period of education was necessary. A situation similar to the one we have here arose after our civil rules of practice were adopted and supplanted our civil code of practice that had existed for about a hundred years. There, too, we were presented with the question of whether adherence to the strict letter of the law was of more importance than was a decision on the merits and justice of the case. In order to avoid unjust results, for a few years we interpreted the rules with extreme liberality; for instance, in the case of White v. Hardin·

County Board of Education (1957) Ky., 307 S.W.2d 754, we said this:

"We must condemn the notice in the present case because the order of May 27 was not an appealable order. However, we take judicial notice that all Kentucky lawyers do not know this, and some confusion has existed on the subject. For this reason, and in view of the fact that plaintiffs made a good faith attempt to appeal from the adverse ruling which was incorporated in the final judgment, we find a substantial compliance with CR 73.03."

But after a reasonable time, that indulgence was discontinued, and in Hawks v. Wilbert, Ky., 355 S.W.2d 655, we said this:

"In considering this and similar failures of counsel to follow the rules of appellate practice, the Court is confronted with many hard decisions. The choice presented is whether it is better to adhere strictly to the rules with some seemingly harsh decisions resulting, or to permit a substantial compliance when no prejudice is shown to have been occasioned by the dereliction. This problem has plagued the Court many times. However, rather than having to decide whether each dereliction is prejudicial, the Court has adopted the policy of strict compliance in the belief that the legal profession should by now be adequately informed on these rules."

We are of opinion that a period of indulgence should be granted in connection with cases arising under the Commercial Code.

The mortgage transaction in the case at bar was a good commercial transaction practiced in accordance with a custom of many generations. It would serve no useful purpose to destroy it and to permit a subsequent creditor to benefit simply because the prior creditor failed to place his signature upon the instrument. All circumstances in the case indicate full notice—and to enact a complete forfeiture because of a minor error during the period when even the essence of the Commercial Code was known only to a few would not be in accordance with a fair conception of justice.

We wish to make it certain that we condemn any deviation from a literal interpretation of the statute and admonish that cases which arise during the transition period will be treated according to. their particular facts.

Judgment affirmed.