THE BURLINGTON NATIONAL BANK, Respondent, v.
STRAUSS, Appellant.*

*No. 97. Argued February 2, 1971.—Decided March 2, 1971.*
(Also reported in 184 N. W. 2d 122.)

* Motion for rehearing denied, with costs, on May 4, 1971.

For the appellant there were briefs by *Byrnes & Bils* of Elkhorn, and oral argument by *John J. Byrnes*.

For the respondent there was a brief by *Kelly & Richter,* and oral argument by *Kirt J. E. Ludwig,* all of Burlington.

HALLOWS, C. J.   Robert Fleming, a farmer near Lake Geneva, borrowed $14,000 from the bank on August 18,

1965, and secured the loan by a standard farm security agreement, which gave the bank a security interest in "All farm equipment now owned or hereafter acquired by [Fleming] and . . . all livestock now owned or hereafter acquired by [Fleming] and the young of such livestock." A properly executed financing statement was filed with the register of deeds of Walworth county on August 23, 1965. Subsequently, the bank made additional loans to Fleming secured by the same collateral. These loans were later consolidated on December 8, 1965, and secured by a standard security agreement, which was filed. On February 6, 1967, the loans or the balance thereof was again re-evidenced by a note and a financing statement filed April 19, 1967.

Prior to this last note and beginning in August, 1966, Fleming began to purchase cattle from Strauss. The purchases of cattle from Strauss were secured by instalment conditional sales notes, and a copy of each was filed in Walworth county. These purchases were also later secured by a chattel mortgage on a Holland grinder mixer used by Fleming on his farm and the mortgage was filed in Walworth county. Between August 19, 1966, and September 27, 1967, Fleming purchased 43 head of cattle from Strauss under this arrangement. During the same period Fleming sold 31 head of cattle from his herd to others and between September 27, 1967, and December 7, 1967, he sold 23 head.

In January of 1968, Fleming was unable to meet his obligations and on January 5th Strauss took possession of 28 head of cattle and the grinder mixer from the Fleming farm and sold the property. On January 12th the bank took a cognovit judgment on its note against Fleming for $15,658.15. Approximately $4,000 was realized upon execution and this suit was brought for the value of the grinder mixer and the cattle. At the trial the value of the grinder mixer was found to be $1,000 and the value of the cattle to be $300 per head.

This case thus presents a conflict of security interest and the priority of creditors' claims against Fleming.

### *Did the bank waive its security?*

Strauss claims the bank was well aware Fleming was selling secured cattle and replacing them by buying from Strauss. It is contended that since the bank acquiesced in these transactions it waived its lien under its after-acquired clause. Strauss relies on the *Bank of Ashippun v. Ells* (1957), 274 Wis. 530, 80 N. W. 2d 357; but, this case is not in point. *Ells* involved a chattel mortgage on specific property with no after-acquired-property clause and was decided prior to the adoption of the Uniform Commercial Code. Prior to the code, it was almost impossible for a lender to maintain in farm financing a valid security on a herd of cattle which was being sold or renewed. *See* Helstad, *Wisconsin UCC Handbook,* sec. 17.12 (2). In order to give more flexibility to such financing, the code freed the debtor from strict accountability to the secured creditor for the property secured, sec. 409.205, Stats.,[1] and recognized the validity of a secured interest in after-acquired property, sec. 409.204 (3).[2]

---

[1] "409.205 **Use or disposition of collateral without accounting permissible.** A security interest is not invalid or fraudulent against creditors by reason of liberty in the debtor to use, commingle or dispose of all or part of the collateral (including returned or repossessed goods) or to collect or compromise accounts, contract rights or chattel paper, or to accept the return of goods or make repossessions, or to use, commingle or dispose of proceeds, or by reason of the failure of the secured party to require the debtor to account for proceeds or replace collateral. This section does not relax the requirements of possession where perfection of a security interest depends upon possession of the collateral by the secured party or by a bailee."

[2] "409.204 **When security interest attaches; after-acquired property; future advances. . . .**

Thus a debtor is now able to commingle his property and use it to his best interest, and the acquiescence of the secured creditor under an after-acquired clause in such a program by the debtor does not invalidate the security interest of the creditor. Sec. 409.205, Stats. *See* Helstad, *supra,* sec. 17.12 (3). Consequently, the bank's knowledge that Fleming was dealing in cattle does not constitute a waiver of its security interest in after-acquired property.

### *The grinder mixer.*

Since the bank has a valid loan and security agreement which was perfected by the filing of financing statements as required by secs. 409.303 (1) [3] and 409.302 (1),[4]

"(3) Except as provided in sub. (4) a security agreement may provide that collateral, whenever acquired, shall secure all obligations covered by the security agreement."

[3] "409.303 **When security interest is perfected; continuity of perfection.** (1) A security interest is perfected when it has attached and when all of the applicable steps required for perfection have been taken. Such steps are specified in ss. 409.302, 409.304, 409.305 and 409.306. If such steps are taken before the security interest attaches, it is perfected at the time when it attaches."

[4] "409.302 **When filing is required to perfect security interest; security interests to which filing provisions of this chapter do not apply.** (1) A financing statement must be filed to perfect all security interests except the following:

"(a) A security interest in collateral in possession of the secured party under s. 409.305;

"(b) A security interest temporarily perfected in instruments or documents without delivery under s. 409.304 or in proceeds for a 10-day period under s. 409.306;

"(c) A purchase money security interest in farm equipment having a purchase price not in excess of $250; but filing is required for a fixture under s. 409.313;

"(d) A purchase money security interest in consumer goods having a purchase price not in excess of $500; but filing is required for a fixture under s. 409.313;

Stats., its security, including after-acquired property, has priority under sec. 409.312 (5) (a),[5] to an after-perfected security of another creditor. Although the trial court stated Strauss' interest in the grinder mixer was for an antecedent debt and Strauss questions this conclusion on appeal, that is not the controlling issue. Whether a pre-existing debt is or is not a valid consideration for a security interest, see 15 Am. Jur. 2d, *Chattel Mortgages*, p. 231, sec. 41; Bankruptcy Act, sec. 60; 11 USCA 96, the priority rank under the code of a valid security interest is unaffected.

Here, the bank's security is entitled to priority as to the grinder mixer over Strauss' chattel mortgage because it was filed on August 23, 1965, almost two years prior to Strauss' filing his chattel mortgage on May 3, 1967. Although it is true, the bank filed financing statements covering after-acquired property subsequent to its original filing on August 23, 1965, no termination statement was filed pursuant to sec. 409.404, Stats.,[6]

"(e) An assignment of accounts or contract rights which does not alone or in conjunction with other assignments to the same assignee transfer a significant part of the outstanding accounts or contract rights of the assignor;

"(f) A security interest of a collecting bank (s. 404.208) or arising under ch. 402 (see s. 409.113) or covered in sub. (3)."

[5] "409.312 **Priorities among conflicting security interests in the same collateral.** . . .

"(5) In all cases not governed by other rules stated in this section (including cases of purchase money security interests which do not qualify for the special priorities set forth in subs. (3) and (4)), priority between conflicting security interests in the same collateral shall be determined as follows:

"(a) In the order of filing if both are perfected by filing, regardless of which security interest attached first under s. 409.204 (1) and whether it attached before or after filing; . . ."

[6] Sec. 409.404 provides, in part: "(1) Whenever there is no outstanding secured obligation and no commitment to make advances, incur obligations or otherwise give value, the secured party must file, and on written demand by the debtor also send the debtor

to cut off the bank's interest in the August 23, 1965, filing. Therefore, the original date must be used to determine the priority of the conflicting claims to the grinder mixer.

### Eighteen identified head of cattle.

Eighteen head of cattle were identified by ear tags as being sold by Strauss to Fleming on conditional sales agreements. Since these conditional sales agreements were taken by Strauss to secure the sale price, he has a purchase money security interest in the cattle. Sec. 409.107 (1), Stats.[7] Where there is a conflict between a purchase money security interest and another security interest, the priority is governed not by sec. 409.312 (5), as was the case with the grinder mixer, but by sec. 409.312 (3) and (4). If the subject of the security interest or collateral constitutes "inventory" of the debtor, the priority of the security interest is determined by sec. 409.312 (3). If the collateral is other than inventory, sub. (4) governs.[8] Livestock whether it makes sense to a dairy farmer or not, is classified as "farm products" and not as inventory by sec. 409.109 (3).[9] Consequently,

---

a statement that he no longer claims a security interest under the financing statement, which shall be identified by file number."

[7] "409.107 **Definitions: 'purchase money security interest.'** A security interest is a 'purchase money security interest' to the extent that it is:

"(1) Taken or retained by the seller of the collateral to secure all or part of its price; . . ."

[8] "409.312 **Priorities among conflicting security interests in the same collateral.** . . .

"(4) A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within 10 days thereafter."

[9] "409.109 **Classification of goods; 'consumer goods'; 'equipment'; 'farm products'; 'inventory'.** Goods are: . . .

Strauss is protected if he has perfected his security interest by filing financing statements within ten days after Fleming received the cattle.

We think Strauss did not perfect his security interest by filing the conditional sales notes and is not entitled to the priority protection of sec. 409.312 (4), Stats., against the after-acquired clause of the bank's security instrument. To perfect a purchase money security interest, sec. 409.302 (1) requires the filing of a financing statement. There are enumerated exceptions to this requirement but none are applicable to this case. Although Strauss filed copies of his conditional sales notes for financing statements, they bore only the signature of Fleming, the debtor, and sec. 409.402 (1) (a) [10] requires the document filed, if it is to qualify as a financing statement, to be signed by both parties, give the debtor's mailing address and the address of the secured party, from which information concerning the security interest may be obtained.

Strauss argues his signature does appear in the body of the conditional sales notes and since sec. 401.102, Stats., requires a liberal construction of the code to promote its underlying purposes and policies, he has sub-

---

"(3) 'Farm products' if they are crops or livestock or supplies used or produced in farming operations or if they are products of crops or livestock in their unmanufactured states (such as ginned cotton, wool-clip, maple syrup, milk and eggs), and if they are in the possession of a debtor engaged in raising, fattening, grazing or other farming operations. If goods are farm products they are neither equipment nor inventory; . . ."

[10] "409.402 **Formal requisites of financing statement; amendments.** (1) (a) A financing statement is sufficient if it is signed by the debtor and the secured party, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor and contains a statement indicating the types, or describing the items, of collateral. A financing statement may be filed before a security agreement is made or a security interest otherwise attaches. . . ."

stantially complied with sec. 409.312 (4). We think Strauss' conditional sales notes are deficient in two respects, in signatures and in lack of address. Only one note (Exhibit 16) bears both a name and an address of Strauss and none of the 18 head of cattle is secured by that note.

If only the question of Strauss' signature were involved, his argument finds support in an Annot., *Construction and Effect of UCC Art. 9, Dealing With Secured Transactions, Sales of Accounts, Contract Rights, and Chattel Paper,* 30 A. L. R. 3d 9, 57–62. The gist of this annotation is that a signature in the body of the instrument substantially complies with the signature requirement of sec. 409.402 (1) (a), Stats. But substantial compliance with this section presupposes the signature fulfills two purposes: (1) Authenticates the existence of the security agreement, and (2) enables subsequent creditors to identify the secured party. Since Strauss' name in the body of the note is in his own handwriting, this might be evidence of his intention to authenticate the conditional sales notes. This view was taken in *Benedict v. Lebowitz* (2d Cir. 1965), 346 Fed. 2d 120. *See also: Alloway v. Stuart* (Ky. 1964), 385 S. W. 2d 41, and *Strevell-Paterson Finance Co. v. May* (1967), 77 N. M. 331, 422 Pac. 2d 366.

However, we do not think that Strauss' name without an address fulfills the second purpose of identification. In *Strevell* the lack of signature was held not to be a fatal defect but the lack of an address was because the filing system provided by the code could not perform its intended function of identifying the secured debtor. It is true, three of the notes had the word "Harvard" after Strauss' name and were dated in Harvard, Illinois. However, unless Harvard, Illinois, is sufficiently small or Strauss is sufficiently well known, two points not covered by the record, a creditor located outside of

Harvard, Illinois, would have a difficult task trying to contact Strauss for information concerning his security interest. Strauss in fact did not live in Harvard but on rural route two. An address must be sufficiently complete to enable a prudent man using reasonable care to locate the secured party. We hold the information contained in the conditional sales notes is not sufficient to substantially comply with sec. 409.402 (1) (a), Stats., because it does not fulfill the purposes of the information and notice contemplated by that section. It is immaterial that the bank may have, in fact, known of Strauss, his identity and residence and was not misled; the financing statements are deficient.

Strauss argues that a conditional sales contract for the purchase price taken by a seller has priority over an after-acquired-property clause of a general mortgage even though there is a failure to file and cites language to that effect in Annot., *Mortgage—After-Acquired Property* (1960), 86 A. L. R. 2d 1152, 1166. This annotation deals with the law prior to the adoption of the Uniform Commercial Code which substantially changed and replaced Wisconsin chattel mortgage law. *See* Synopsis of Chapter 409, 40c W. S. A. 119.

### *Unidentified cattle.*

Ten head of cattle were unidentified by ear tags. Strauss claims they are cattle he sold Fleming and their ear tags fell off. The trial court held there was insufficient proof that they belonged to Strauss and this finding is contested. However, if these cattle were identified as being sold by Strauss, they would fall in the same category as the 18 head of cattle so far as the priority of instalment notes covering them, with the possible exception of one note (Exhibit 16) involving three cows.

Furthermore, we believe the trial court is right in concluding that Strauss did not meet the quantum of proof to show that these were his cows. Whether Fleming was to be believed was a determination for the trier of the fact. The court did not accept Fleming's testimony that he could identify the cows without ear tags as being those sold by Strauss. This testimony was incredible because if these 10 head in fact had been sold by Strauss to him, Fleming could not have sold any of the cattle he purchased from Strauss. Yet he testified on the trial he did sell some of the Strauss cattle.

*By the Court.*——Judgment affirmed.