**AUBURNDALE STATE BANK,**
Plaintiff–Appellee,

v.

**DAIRY FARM LEASING CORPORA-
TION, Defendant–Appellant.**

No. 88–2999.

United States Court of Appeals,
Seventh Circuit.

Argued April 10, 1989.

Decided Nov. 17, 1989.

As Amended Nov. 27, 1989.

H. James Tuchscherer, Nash, Podvin, Tuchscherer, Huttenburg, Weymouth & Kryshak, Wisconsin Rapids, Wis., for plaintiff-appellee.

Peter Herrell, Jordan, Herrell & Thiel, Eau Claire, Wis., for defendant-appellant.

Before BAUER, Chief Judge, CUMMINGS, Circuit Judge, and WILL, Senior District Judge.*

WILL, Senior District Judge.

This case arises from a dispute over the proceeds from the sale of Kenneth and Koreen Brock's milk cows. The Brocks were unsuccessful with the cows, they declared bankruptcy and their creditors were left to figure out who owned the cows. The cow dispute pitted a cow lessor against the bank, which held a security interest in some of the Brocks' property. The parties stipulated before trial that the leasing company owned at least four of the sixteen cows left from the failed dairy venture. The trial court awarded the sale proceeds of those four to the leasing company and the proceeds of the remaining twelve cows to the bank. We reverse in part and remand.

## I. Background.

The leasing company, Dairy Farm Leasing Corporation ("Dairy Farm"), is based principally in Minneapolis, Minnesota al-though it also has a facility outside of Menomonie, Wisconsin. Auburndale State Bank ("the Bank") was the Auburndale, Wisconsin bank which held a security interest in some of the Brocks' property. Although Mr. Brock also worked full time at a paper mill in July 1976, the Brocks started dairy farming part time, using Mr. Brock's retirement money from the paper mill and taking out a loan on July 30, 1976 to buy cows and farm equipment. The Bank took a non-purchase money security interest in the Brocks' dairy cattle and filed on August 2, 1976 a financing statement covering "all livestock now owned or here-after acquired by debtor and the young of all livestock." Plaintiff's ("Plf.") Exhibit ("Ex.") 1. A continuation statement was filed on February 23, 1981. *Id.*

On April 28, 1981, the Brocks acquired even more cows by leasing twelve from Dairy Farm.[1] They filed a credit application with Dairy Farm showing their indebtedness to the Bank and the Bank's security interest in the Brocks' three cows, their real estate and their tractor. Dairy Farm leased ten more cows to the Brocks on March 29, 1982, and they also entered into a security agreement which granted Dairy Farm a security interest in "[a]ll livestock now owned or hereafter acquired by Debtor, and the young of all livestock" along with other property of the Brocks. Defendant ("Def.") Ex. 2. Shortly before October 19, 1983, the Brocks signed a reaffirmation of the leases. Def. Ex. 3 (document undated, envelope stamped received by Dairy Farm on October 19).

Dairy Farm filed a UCC Financing Statement on April 5, 1982 to give notice of the leases and to perfect its security interest in the Brocks' property, including the progeny of the cattle. Def. Ex. 12; Trial Transcript ("Tr.") at B 59 (i.e., volume B, p. 59). Bank representatives knew of Dairy Farm's right to the leased cattle at least by April 21, 1983, as shown by the Bank's Farm Person-

---

* The Honorable Hubert L. Will, Senior Judge of the United States District Court for the Northern District of Illinois, Eastern Division, is sitting by designation.

1. The Bank states that "the Brocks ... periodically replac[ed] worn out dairy cows with new cows and borrow[ed] additional funds from the Bank to do ... so." Brief of Plaintiff–Appellee at 2. However, the pages of the trial transcript which the Bank cites do not support that contention.

al Property Inventory and Appraisal form on which Thomas Henseler, a loan officer at the Bank, had written "20 head leased." Plf. Ex. 5; Tr. at A 19 (Mr. Henseler's testimony as to the date when he wrote "20 head leased" is not clear, although he testified that the document was *reviewed* on April 21, 1983). The Brocks also purchased cattle from Mid State Livestock on credit. Mid State retrieved the cattle in which it asserted a purchase money security interest on October 9, 1987, mem. op. at 7, but no claims are raised by or against that entity in this suit.

On approximately October 8, 1986, the Bank filed an action in Wood County Circuit Court for replevin of the Brocks' dairy herd and mortgage foreclosure. The Brocks' two leases with Dairy Farm were to expire in 1985, but were renegotiated on October 30, 1986, and backdated to December 29, 1985. On December 1, 1986, the Wood County Circuit Court awarded the Bank legal right to all livestock *owned by the Brocks* (which, of course, would exclude those leased to them by Dairy Farm). On that same day, the Brocks filed for bankruptcy protection under Chapter 7 and stopped making rental payments to Dairy Farm. The bankruptcy court entered an order pursuant to 11 U.S.C. § 522(f)(2) (1982) (which exempts certain property for "household use" from creditors' claims) avoiding the Bank's non-purchase money security interest in two of the Brocks' dairy cows.

The Brocks kept no written records of the number of cattle they owned, what happened to them, or which cows calved or how many calves the cows had. Brock Deposition ("Br.") Tr. at 35. Mr. Brock testified that he was "familiar with" his cows. Br. Tr. at 8. He said he knew which calf came from which cow, *id.* at 35, and which were subject to the claims of Dairy Farm and Mid State Livestock. *Id.* at 36–37. However, Mr. Brock did not rely on the numbering system used by Dairy Farm and the Bank to identify cows. Br. Tr. at 10–11 ("Those numbers don't mean a thing to me").

The Bank and Dairy Farm, at various points, took steps to identify their cows, since they apparently knew of the probability of conflicting claims. On October 30, 1985, the same day on which Dairy Farm representatives renegotiated leases with the Brocks, the representatives also photographed and ear tagged what they allege were Dairy Farm-owned cattle on the Brocks' farm. Tr. at B 98. However, the Dairy Farm personnel relied for their tagging solely on Mr. Brock's memory rather than any other records. Tr. at B 105–06. On February 21, 1987, the Bank and a cow appraiser, Lyle Schwann, took inventory and appraised the cattle. Plf. Ex. 8; Tr. at A 32–34. On October 20, 1987, the last day the cattle were on the Brock farm, Dairy Farm representatives again photographed and tagged the cows. Later that day the Bank removed all the cattle from the farm, which included sixteen cows and five heifers.

Thomas Henseler from the Bank and Alfred H. Keith, the President of Dairy Farm, testified that they each had made unsuccessful attempts to work out the cow ownership problem. Although the Bank represents in its brief that its representatives spoke to Dairy Farm "repeatedly" about the necessity of resolving the cow ownership issues, Brief of Plaintiff–Appellant at 4, the record does not fully support that characterization of the parties' attempts to negotiate. Henseler testified that he spoke to Steve Freeley in 1986 and Al Keith in September or October 1987, Tr. at A 37, and that he had "several discussions" with representatives of Dairy Farm trying to resolve their conflicting claims in the bankruptcy proceeding. *Id.* at 39.

On October 16, 1987, Henseler spoke to Keith regarding Dairy Farm's offer to move the cattle to its Menomonie facility and "to meet and settle the dispute there." Tr. at A 51–52. Henseler also testified that the Bank, between October 20 and 22, notified Dairy Farm that it had picked up the cattle and also gave notice "that we have got the animals, let's meet and talk this thing over." Tr. at A 52. According to Henseler, Dairy Farm's response was "they weren't coming over." *Id.* The trial

record includes Henseler's notes recorded after his telephone conversations with Dairy Farm representatives, Plf. Ex. 9, but he admitted that he "recorded all of them on that Friday [Oct. 22]." Tr. at A 63. Henseler also admitted that, as far as he knew, the Bank gave no written notice to Dairy Farm of its intention to sell the cows, Tr. at A 76–77, and that, after the cows were removed, he made no calls to Dairy Farm. However, according to Henseler, the Bank's attorney made calls after the cows were moved. Plf. Ex. 9.

Mr. Keith testified that on October 16, 1987, he spoke to Mr. Henseler at the Bank and set up a meeting for the following Tuesday, October 20, to sort out cow ownership. He testified, in addition, that he offered to care for the cows at no cost until the issue of ownership could be resolved, but the Bank refused. Tr. at B 50. (Henseler, on the other hand, said that he remembered no such offer. Tr. at A 62). On October 19, 1987, Keith testified that he called the Bank to confirm their meeting for the following day. However, "[a]t around 5:00 that evening I received a call from Tom [Henseler]. He said they had a meeting with four people at the bank. They are going to refer it to counsel. They saw no point in negotiating, and they were going to take all of the cows." Tr. at B 47.

Brock agreed to allow the Bank to take the cattle in exchange for a release of Brock's liability to it. Br. Tr. at 21–22. Dairy Farm representatives came to the Brock farm to take their cattle, and Brock testified that he refused to turn them over. Br. Tr. at 21–22. The Bank, in its statement of facts, also states that Brock refused to turn over the cattle. Brief of Plaintiff–Appellant at 4–5. However, the trial judge came to a different conclusion in her opinion: that the Dairy Farm representatives refused to take cows. Mem. op. at 6. The trial court's conclusion was apparently based on Tom Henseler's notes in which he wrote, "Ken stated that Dairy Farm Leasing had a truck there at 10:00 a.m. but would not take cattle." Plf. Ex. 9. Henseler testified that on October 20, Brock told him that the Bank should take the cattle, because he intended to stop taking care of them. Tr. at A 48–49. On October 23 and 24, the Bank sold all of the dairy cattle for slaughter.

Two Dairy Farm employees, Vern Lundquist and David Hansen, testified that not all of the cattle should have been slaughtered, since some were still in milking condition or could be returned to milking condition. A 49–50, B 97–98, 129–31. Mr. Brock also testified that only four or five of the cows should have been slaughtered. Br. Tr. at 46. On the other hand, Lyle Schwann (who picked up the cattle for the Bank on October 20), Joseph Kraus (a member of the Bank's board who saw the cattle on October 20) and Chris Kooiman (an auctioneer who observed the herd on October 21) testified that the cattle were in poor condition. Friedrickson, from Mid State Livestock, testified that his cows were in poor condition when he picked them up on October 9. The trial court concluded, apparently on the basis of the testimony of Schwann, Kraus, Kooiman and Friedrickson, mem. op. at 7–9, that "the fair market value is the amount plaintiff received for the cows from the slaughterhouse." Mem. op. at 17.

The Bank commenced this action in Wisconsin state court on October 23, 1987, and Dairy Farm removed it to federal district court. The Bank's action asked for a declaratory adjudication of the ownership of the cow sale proceeds which were being held in escrow. Dairy Farm counterclaimed that it owned all of the cows, because they were progeny of its cows which had been leased to the Brocks. Dairy Farm claimed damages for the slaughter of its cows and also punitive damages. In addition, Dairy Farm claimed that the Bank was liable for conversion and for procurement of the breach of a contract between the Brocks and Dairy Farm. A trial was held on August 22, 1988 and the trial court issued its decision on September 14, 1988. The court awarded all of the proceeds from the sale of the cattle to the Bank, except for proceeds from the four cattle stipulated to have belonged to Dairy Farm. Judgment was entered on September 16, 1988 and this appeal followed.

## II. Analysis.

### A. Motion to Dismiss Appeal in Total.

On December 1, 1988, the Bank filed a Motion to Dismiss Appeal in Total based on Dairy Farm's acceptance of payment for the four cows which the Bank agreed they owned. The Bank argues that "a party who accepts the money awarded him in the portion of the judgment in his favor thereby waives his right to appeal from the whole judgment." Memor. in Supp. of Motion to Dismiss at 1 (citing *Laird v. Giffin*, 84 Wis. 286, 54 N.W. 584 (1893)). The Bank's argument, which relies on the "rule of waiver," was made before the Wisconsin Supreme Court in *Estreen v. Bluhm*, 79 Wis.2d 142, 255 N.W.2d 473 (1977), and failed there.

The rule of waiver was applied in *Laird*, because the plaintiff there had received payment of funds from the garnishee, Giffen, *on condition* that he pay Giffen's litigation costs. 54 N.W. at 585. The *Estreen* court explained, however, that "[a] party which accepts the benefits of a judgment does not waive the right to take an appeal which does not involve a reversal of that part of the judgment under which the benefit was received." 255 N.W.2d at 479. In *Estreen*, as in the present case, the appeal did not involve a reversal of the partial judgment in favor of the appellant. Dairy Farm did not receive the proceeds of the four cows on condition that it relinquish any right to other proceeds. "[T]he acceptance of payment under a judgment for less than the amount claimed does not prevent an appeal to modify the judgment or to increase the recovery to the full amount claimed." *Id.*

### B. Proof of Cow Ownership.

At trial, the Bank contended that Dairy Farm's interest in the cows was not a true lease, but was a security interest which was trumped by the Bank's prior security interest. The trial court determined that Dairy Farm had a true lease with the Brocks and therefore retained a property interest in its cows as well as any replacement cows. Mem. op. at 14. The court wrote that:

the Brock lease was a true lease and not a security agreement subject to the requirements of Article Nine of the Uniform Commercial Code. Defendant [Dairy Farm] retained title to the original cows and any replacement cows. Thus, defendant's ownership rights in the original and replacement cows trump plaintiff's [the Bank's] perfected security interest in all of the livestock on Brock's farm. However, defendant must be able to identify the original and replacement cows. Plaintiff has the right to possession of all of the cows that defendant cannot prove belonged to it; its security interest in all livestock, now or hereafter acquired, entitles it to assume all the livestock is subject to its lien, unless it can be shown otherwise.

*Id.* (citing *Burlington Nat'l Bank v. Strauss*, 50 Wis.2d 270, 184 N.W.2d 122 (1971)).

Although the trial judge concluded that Dairy Farm had the right to original and replacement cows, she did not mention that Dairy Farm also had a property interest in the progeny of its cows as is provided for by the lease agreement. Def. Ex. 1. The court wrote that "as to the progeny of any leased cows, the issue is simple: defendant had only a security interest that was not recorded, and therefore not perfected." Mem. op. at 14. "[D]efendant's interest in any of the progeny of its leased cows was secondary to plaintiff's lien on all the livestock." *Id.*

Having resolved that Dairy Farm had the burden of identifying its cows and that it only had a property interest in originals and replacements, the court wrote that Dairy Farm could only identify "three of its original cows when its employees examined the herd on October 20, 1987," *id.* at 15, and its effort to identify additional cows with photos in October 1986 was flawed and unpersuasive, since it relied on Mr. Brock's flawed memory. *Id.* at 15–16. As a result, the court awarded Dairy Farm only the sale proceeds for the four cows that the parties had stipulated Dairy Farm owned. *Id.* at 16–17.

We consider two errors alleged by Dairy Farm: whether the trial court placed the proper burdens on the parties with regard to proof of ownership and whether Dairy Farm had a right to the progeny of its cows. The trial court treated this case as a declaratory judgment action to determine the property rights of the two parties. No one disputes the court's application of Wisconsin substantive law to the issues before it.[2]

In concluding that Dairy Farm should have the burden of identifying its cows, the trial court relied on the case of *Burlington National Bank v. Strauss*, 50 Wis.2d 270, 184 N.W.2d 122 (1971). From that case, the court arrived at the rule that if a holder of a superior interest cannot identify its own cattle, then the holder of the lesser, but general, lien obtains possession of them. The district court wrote that *"[Burlington]* court placed burden on defendant to identify livestock in which defendant had a security interest that would have been senior to that of plaintiff, which had a general lien on all livestock now owned or hereafter acquired." Mem. op. at 14–15.

The *Burlington* court's statements regarding defendant's failure of proof are dicta, since the case turned on the fact that the defendant, Strauss, had not perfected his purchase money security interest. Strauss had missed the required ten-day window for filing his conditional sales note and, therefore, his interest was secondary to plaintiff's security interest in all of the debtor's property. The *Burlington* court went on to express approval of the trial court's decision that Strauss had failed to prove ownership either with ear tags or by the testimony of the debtor, since the debtor's testimony was inconsistent with the facts of the case and, therefore, incredible. There is no discussion of whether the bank had presented evidence of the debtor's (and, therefore, its) ownership of the disputed cattle.

We find that the trial judge, in the present case, erred by creating a presumption of ownership in favor of the general interest holder. The *Strauss* dicta are not sufficient authority for such a rule in the face of the general rules on burden of proof. The general rule is that the party that asserts the affirmative of an issue has the burden of proving the facts essential to its claim. *Miller v. Milwaukee Odd Fellows Temple*, 206 Wis. 547, 240 N.W. 193, 199 (1931) (party seeking to establish the invalidity of the defendant's title assumed the burden of proof on that issue); *Chybowski v. Bucyrus Co.*, 127 Wis. 332, 106 N.W. 833, 837 (1906) (plaintiff loses personal injury suit, because he claimed that a steam hammer was defective but failed to present credible proof of that allegation); 29 Am.Jur.2d *Evidence* § 127 (1967). Another way of stating this rule is that the party who would lose if no evidence were presented has the burden. 29 Am.Jur.2d *Evidence* § 128 (1967) (citing *Thoe v. Chicago, Milwaukee & St. Paul R.R. Co.*, 181 Wis. 456, 195 N.W. 407 (1923)); Annotation, *Burden of Proof in Actions under General Declaratory Judgment Acts*, 23 A.L. R.2d 1243, 1253 (1952).

In the present case, there is no reason to create a presumption that either Dairy Farm or the Bank (by virtue of its security interest) had title to any of the cows. With the exception of the four stipulated to belong to Dairy Farm, the Bank in its complaint (at p. 2, ¶ 1) claimed, and Dairy Farm in its answer (at ¶ 2) counterclaimed, all of the remaining cows. The Bank bore the burden of proving its claim and Dairy Farm had the burden of proving its counterclaim. Absent a presumption, either party would lose if it presented no evidence. However, we can see no reason why the burden should be placed solely on Dairy Farm to prove ownership, especially since the Bank knew of Dairy Farm's ownership interest, could have acted to preserve evidence of the identity of Brock's cows, and was responsible for their sale and destruction. If

2. The more difficult question, which was addressed in *Allstate Insurance Company v. Charneski*, 286 F.2d 238 (7th Cir.1960), is whether a federal court should assume jurisdiction pursuant to the federal declaratory judgment statute (28 U.S.C. § 2201(a)) when there is a state policy against hearing that type of case. That issue, however, is not raised by this case.

we consider the incentives involved, the rule should be that all parties asserting ownership should take measures to prove the identity of their own.

■ Turning to the progeny issue, we note that the lease agreement signed by the Brocks retained for Dairy Farm the right to the progeny of its cattle. The agreement provides in relevant part that " 'A' hereby leases to 'B' and 'B' hereby leases from 'A' twenty-two (22) cows, ... and any and all offspring, progeny and replacements thereof...." Def. Ex. 1 at ¶ 1. Even more explicitly, the lease states that "[t]itle and ownership of all animals furnished by 'A' *and of their progeny* and any replacements, shall be and remain in the name of 'A' until final settlement of this Lease." *Id.* at ¶ 6 (emphasis supplied). Therefore, contrary to the district court's resolution of this issue, Dairy Farm had a superior title interest in the progeny of its cows to the security interest of the Bank. We need not decide whether the district court was correct that Dairy Farm had not perfected its security interest, *see* mem. op. at 14, since Dairy Farm had a superior *ownership* interest in the progeny.

Dairy Farm claims that the trial court erred by disregarding the evidence it presented of ownership, especially since Dairy Farm alleges that the Bank did not present any evidence of its ownership. Because we have found that the court erred by placing the burden of proving ownership solely on Dairy Farm and by denying Dairy Farm's title interest in the progeny of its cows, we decline to consider the sufficiency of Dairy Farm's evidence at this time. We remand for a reconsideration of the ownership issues. On remand, the district court should consider all evidence of ownership presented by both parties in deciding who owned which cows.

### C. Dairy Farm's Conversion and Procurement of Breach Claims.

After denying that Dairy Farm's evidence supported a claim of conversion, the court wrote:

Even if plaintiff were liable for conversion, defendant would be entitled to no more than what it is to receive under the terms of this order: the fair market value of the four cows that it owned, plus interest from the date on which plaintiff took possession of the cows.

Mem. op. at 20 (citing 18 Am.Jur.2d *Conversion* § 105 (1967)). With regard to Dairy Farm's allegation that the Bank procured the Brocks' breach of contract, the court reasoned that Dairy Farm had failed to pursue the claim so the court would not consider that argument. *Id.* at 20–21. Dairy Farm claims that the trial court erred by denying its counterclaim for conversion and by finding that Dairy Farm had failed to pursue its claim of procurement of breach of contract.

■ However, Dairy Farm is entitled, under both its conversion and procurement of breach claims, to no more than the value of its lost cattle plus interest. Therefore, we will not consider these alleged errors. For a procurement of breach claim, a party has a right to the actual damages it suffered due to the contract breach. *Segall v. Hurwitz,* 114 Wis.2d 471, 339 N.W.2d 333, 341 (Ct.App.1983). Here, those damages are the value of Dairy Farm's cattle. In a conversion action, the injured party "may recover the value of the property at the time of the conversion plus interest to the date of the trial." *Metro. Sav. & Loan Ass'n v. Zuelke's, Inc.,* 46 Wis.2d 568, 175 N.W.2d 634, 639 (1970) (quoting *Traeger v. Sperberg,* 256 Wis. 330, 41 N.W.2d 214, 216 (1950)). Dairy Farm may have pursued these claims in hopes of obtaining punitive damages. We turn, therefore, to that issue.

The trial court found that Dairy Farm had "adduced no evidence that would support an award of punitive damages. Such an award requires a showing of fraud, ill will, recklessness, willful disregard of another's rights or other circumstances tending to aggravate the injury." Mem. op. at 20 (citing 18 Am.Jur.2d *Conversion* § 114 (1967)). "[A]n award of punitive damages is a matter within the discretion of the trial court." *Wood v. Worachek,* 618 F.2d 1225, 1233 (7th Cir.1980). The Wisconsin Supreme Court has written that "a claim for

punitive damages may be supported by proof of aggravating circumstances beyond those supporting compensatory damages." *Wangen v. Ford Motor Co.*, 97 Wis.2d 260, 294 N.W.2d 437, 442 (1980). The *Wangen* court continued:

> [I]n order that punitory damages may be assessed, something must be shown over and above the mere breach of duty for which compensatory damages can be given; that is, a showing of a bad intent deserving punishment, or something in the nature of special ill will towards the person injured, or a wanton, deliberate disregard of the particular duty then being breached....

*Id.* 294 N.W.2d at 443 (quoting *Meshane v. Second Street Co.*, 197 Wis. 382, 222 N.W. 320, 322 (1928)). The *Wangen* court also quoted from *Anderson v. Continental Insurance Company*, 85 Wis.2d 675, 271 N.W.2d 368, 379 (1978) as follows: "For punitive damages to be awarded, a defendant must not only intentionally have breached his duty of good faith, but in addition must have been guilty of oppression, fraud, or malice...." *Id.*

Dairy Farm contends that it has a right to punitive damages because the Bank "intentionally removed all the dairy cattle from the Kenneth Brock farm," did not give Dairy Farm written notice of the sale of the cattle, and converted the cattle, which "is by definition a willful and deliberate act." Brief of Defendant–Appellant at 29. The quoted discussion from the *Wangen* decision shows that a party claiming punitive damages must show something more than a simple legal violation. This principle was essential to the *Wangen* court's affirmance of exemplary damages in that case. 294 N.W.2d at 462. Therefore, the Bank's intentional removal of the cows from the Brock farm is an insufficient basis for punitive damages.

In the present case, the trial court's denial of exemplary damages is also justified by the evidence that Mr. Brock refused to take care of the cattle any longer, forcing the parties to take quick action. Although our discussion of the facts shows that there is some question whether the court was correct to conclude that Dairy Farm refused to take its cattle when it came to the farm on the morning of October 20, this possibly erroneous finding does not affect our review of the punitive damages issue. Even if Dairy Farm had been thwarted by Brock in its attempt to take its cattle, this fact does not make the Bank's conduct willful or wanton.

Dairy Farm comes closest to showing willful conduct on the part of the Bank with its argument that the Bank gave it no notice of an intention to sell the cows before they were slaughtered. That act made it substantially more difficult for the parties to sort out ownership. However, it was not an abuse of discretion for the trial judge to deny punitive damages based on Dairy Farm's allegation that it was not given notice.

Dairy Farm never disputes that it had notice that the Bank had the cows. It contends only that it did not have written notice and that there was no evidence in the record that Dairy Farm personnel knew of the Bank's intention to sell the cows. However, the Bank submits that the record included Mr. Henseler's notes of phone calls made by the Bank's attorney, Mr. Tuchscherer, to Dairy Farm. Henseler wrote, "Tuchscherer in contact with Dairy Farm Leasing counsel. Invited Dairy Farm to meet at site of herd to settle matter on 10–22–87 because the cows would have to be disposed of on 10–23–87." Plf. Ex. 9. Those notes of phone calls are not in a particularly reliable form. Not only are they self-serving, but they are also hearsay (notes by Henseler about what Tuchscherer said to Dairy Farm personnel).

Nevertheless, even though the trial court should not have relied on the Henseler notes as proof of Dairy Farm's knowledge, the court was not forced to conclude that the Bank was maliciously destroying evidence. Dairy Farm knew that the Bank had the cows and was not likely to pay to keep them for very long. In addition, much of the evidence showed that the cows were in poor condition, so that the Bank's decision to slaughter them is easily explained as a reasonable economic choice

rather than an attempt to destroy evidence of ownership. The trial court did not abuse its discretion by denying Dairy Farm's claim for punitive damages.

### III. Conclusion.

Because the trial court erred by creating a presumption that the Bank, as a general security interest holder, owned the disputed cattle, we reverse the court's decision to give all the disputed sale proceeds from the cattle to the Bank and remand for consideration of the Bank's and Dairy Farm's evidence of ownership. We affirm the trial court's denial of Dairy Farm's request for punitive damages.