In re **COLLATED PRODUCTS CORPORATION, Debtor.**

**UNITED JERSEY BANK/CENTRAL, N.A., Defendant Below, Appellant,**

v.

**COLLATED PRODUCTS CORPORATION, Plaintiff Below, Appellee.**

**Civ. A. No. 90–190 MMS.**
**Bankruptcy No. 89–479.**
**Adv. No. 89–101.**

United States District Court,
D. Delaware.

Nov. 16, 1990.

James L. Patton, Jr., Laura Davis Jones, and Teresa C. Fariss of Young, Conaway, Stargatt & Taylor, Wilmington, Del.; Richard N. Shaine, and Jeffrey M. Rosenthal of Stark & Stark, Princeton, N.J., of counsel, for defendant below, appellant.

Peter J. Walsh, and Charlene D. Davis of Bayard, Handelman & Murdoch, P.A., Wilmington, Del., for plaintiff below, appellee.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

This is an appeal from an order of the bankruptcy court, dated March 18, 1990. 116 B.R. 406. The bankruptcy court held that, *inter alia*, the United Jersey Bank/Central, N.A., (the "Bank") did not waive its security interest in the proceeds of certain accounts of its debtor, Collated Products Corporation ("Collated") and the Bank does not have a security interest in a certain "commingled" deposit account of Collated pursuant to N.J.S.A. § 12A:9–306(4)(d). For the reasons stated below, the decision of the bankruptcy court is affirmed on the non-waiver of the security interest in the proceeds of accounts and reversed as to the Bank's retention of a security interest in the commingled account.

## I. FACTUAL BACKGROUND

On August 18, 1988, Collated and the Bank executed a series of documents in order to settle an ongoing dispute. As a result of this settlement, Collated set aside certain claims against the Bank, and in return the Bank reduced the amount of Collated's debt from several million dollars to $910,000. The figure of $910,000 represents the Bank's estimate of the total value of Collated's assets. The documents executed at that time include a Settlement Agreement, a General Security Agreement, a Schedule of Collateral, a secured note and several mutual releases. (*See*, Exhibit D of Docket Item ("Dkt.") 6A.) The Bank's se-

curity interest was perfected by the filing of a U.C.C. financing statement and a copy of the Security Agreement with the Delaware Secretary of State.[1] The documents also provide that New Jersey law would govern the transaction.

The Schedule of Collateral consists of an extensive enumeration of the assets owned by Collated subject to the Bank's security interest. The Schedule, in pertinent part, reads as follows:

(i) Inventory of Borrower, whether now owned or hereafter acquired, including, without limitation, raw materials, work in process, finished goods, consigned goods, and materials used or consumed in business and other goods held for sale or lease or furnished or to be furnished under contracts of service.

(ii) Accounts of Borrower, whether now existing or hereafter arising, including, without limitation, all accounts receivable and contract rights and any rights of payment for goods sold or leased or for services rendered which are not evidenced by instrument or chattel paper, whether or not such rights have been earned by performance.

. . . .

(iv) Instruments (including, without limitation, negotiable instruments and non-negotiable instruments), chattel paper, general intangibles (including, without limitation, income tax refunds, franchise rights, trade secrets, formulae, customer lists, and good will), and documents or title (including, without limitation, bills of lading, dock warrants, dock receipts and warehouse receipts), all of Borrower, whether now owned or existing or hereafter arising or acquired;

. . . .

(vi) as to all of the foregoing . . . cash proceeds, noncash proceeds and products thereof, additions and accessions thereto, replacements and substitutions therefor, and all related books, records, journals, computer print-outs and data, of Borrower.

---

**1.** For purposes of this appeal, there is no dispute as to whether the security interest was properly perfected.

Pursuant to Paragraph 2 of the Settlement Agreement, Collated retains the authority to utilize proceeds of its accounts in its own discretion. Paragraph 2 reads:

2. Effective as of the date of this Agreement, Collated shall be permitted to retain and use, in Collated's sole discretion, all of the proceeds, of Collated's accounts. The Bank hereby agrees that upon the written request of Collated, the Bank will subordinate its lien upon the accounts of the Borrower as described in Section (ii) of Schedule A to either (i) a lien in favor of a lending institution providing a line of credit for working capital purposes to Collated or (ii) the general unsecured creditors of Collated in return for more favorable payment terms upon Collated's accounts payable.

After the execution of these documents, Collated moved its deposit accounts from the Bank to the Delaware Trust Company.

Collated is engaged in the business of manufacturing game cards and direct response card decks, the latter being the focus of this dispute. Direct response card decks are advertisements which manufacturers send to designated addressees. The card decks include prepaid postage reply cards, which the addressees may detach and send to the manufacturer in order to submit an order for goods. The manufacture and mailing of these card decks generate 65% to 70% of Collated's gross sales.

Collated's brochures describe the process of manufacturing and mailing the card decks. (See, Exhibit F of Dkt. 6A.) Collated's customers first submit an order for card decks, whereupon Collated designs and prints a blueprint of the card decks for the customer's approval. Once the blueprint has been approved, Collated's customers are obligated to provide prepayment to Collated for anticipated postage costs no later than fifteen days prior to the mailing date which the customer has set. As stated in Collated's specifications, "You [the customer] furnish postage in advance by check to: Postmaster, Newark, Delaware. Mail the check to us 15 days prior to mailing date." (Exhibit F of Dkt. 6A.) Upon receiving the payments for the postage

costs, Collated prints, cuts, and collates the card decks in quantities determined by the customers. Collated attaches an address to each card deck and places the card decks in mail bags which are then picked up by the Post Office.

Postage costs are substantial. The bankruptcy court found "for the period February through August 16, 1989, Collated billed a total of $1,556,914 for card deck jobs. Customers made advance payments for postage costs of $1,050,357." (Dkt. 6A, Exh. B, p. 4.) The Post Office does not accept the card decks unless the postage costs have been prepaid.

Three methods of payment of the postage costs developed: 1) a customer furnishes Collated with a check payable to the Postmaster in Newark, Delaware, and thereafter Collated turns the check over to the Post Office which credits Collated's permit postage account in the amount of the check; 2) a customer provides Collated with a check payable to the Postmaster which identifies that customer's postage permit number, and thereafter the Postmaster credits the account of the customer after receiving the check from Collated; 3) a customer provides postage payments through a check payable directly to Collated, and thereafter Collated deposits that check and draws its own check payable to the Postmaster for the postage costs. The third method of payment has spawned this dispute between Collated and the Bank.

Before May 1989, Collated deposited such checks in a deposit account called "Postage Segregated Account." On the advice of counsel, Collated removed $26,000 from the Postage Segregated Account in May 1989 and deposited that amount into its operating account. Thereafter until August 4, 1989, Collated deposited checks for postage payments directly into its operating account for the express purpose of creating a "commingled account" under N.J.S.A. § 12A:9–306(4).

On its invoices, Collated set forth the amount of payment due for the printing, cutting and collating of the card decks. A separate entry was made for the postage charge and the mode of payment selected

by the customer. Since the Post Office determines the postal charges, Collated cannot calculate the exact cost of the postal services in advance, and as a result, invoices reflect normal deviations of actual costs compared to the amount provided by the customer. The average overpayment was $263.81 or 2.6% of the average postage cost while the average underpayment was $361.15 or 3.5% of the average postage cost. Customers would either be credited any excess payment of postage funds or be required to furnish the deficient amount to Collated.

There was no obligation placed upon Collated by its customers to deposit postage monies into a segregated account or to act as a trustee with regard to the funds. Collated retained complete control over both the Postage Segregated Account and its "commingled" operating account. All interest earned from the Postage Segregated Account and the "commingled" operating account accrued to the benefit of Collated. At times Collated used postage overpayments by customers to cover similar underpayments of other customers. On infrequent occasion, Collated would also use the postage payments to cover a cash shortfall for other operating expenses, such as payroll.

Collated's analysis of the deposits to this "commingled" account after May 12 indicates that those deposits consisted of $116,380 from customer postage prepayments along with $3,645 interest income, miscellaneous income from scrap metal sales and vending machine commissions of around $1,062, a federal income tax refund of $5,000 and an unspecified amount of routine accounts receivable. (See Dkt. 7 at p. 19.) Collated's last deposit in the "commingled" account before filing bankruptcy was made on August 4. At the time of the last deposit the account contained $329,767.

On August 8, 1989, Collated began depositing its cash proceeds into a "Special Account," which it used as an operating account until August 17, 1989. Collated's handwritten account summary reveals that from August 8, 1989 to August 14, 1989, Collated received and deposited $171,071.95 into its "Special Account" in proceeds from accounts receivable. On August 16, 1989, only $345 remained in the "Special Account."

On August 16, 1989, Collated filed a reorganization petition under Chapter 11 of the Bankruptcy Code. No deposits were made into the "commingled" account during the ten-day period prior to the commencement of the bankruptcy proceeding. Since the filing date, Collated has continued to operate its business and manage its affairs as a debtor-in-possession. Following the filing of the petition, Collated filed an adversary proceeding seeking a declaratory judgement that its "commingled" account was not subject to the Bank's security interest. On August 21, 1989, Collated filed a Preference Action seeking to avoid as a preferential transfer the security interest in the collateral taken by the Bank on August 18, 1988. The Preference Action is still pending in the bankruptcy court and no trial date has been set.

## II. APPEALABILITY

■ A threshold concern is the jurisdiction of this court to entertain this appeal. Section 158(a) of Title 28 governs appeals to district courts from judgements, orders and decrees of bankruptcy judges. The pertinent part of that provision provides:

The district courts of the United States shall have jurisdiction to hear appeals from final judgements, orders, and decrees, and, with the leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered into cases and proceedings referred to the bankruptcy judges under section 157 of this title.

At issue is whether the requisite finality has been satisfied in light of the Preference Action still pending before the bankruptcy court. Collated argues that this court should stay its hand and await the outcome of the Preference Action and thereafter entertain any appeals which would address the disposition of Collated's entire estate, inclusive of the disputed "commingled" account. At present the bankruptcy court is awaiting the outcome of this appeal. (Dkt. 10.)

■ Analysis of finality in bankruptcy cases differs from litigation in ordinary civil cases. In bankruptcy litigation, concepts of finality are not restrictively applied because it would be impractical to wait until the conclusion of the entire bankruptcy case or until a plan is confirmed before hearing any appeals of a discrete issue within the bankruptcy proceeding. *In re Jeanette Corp.*, 832 F.2d 43, 45 (3d Cir.1987); *In re Brown*, 803 F.2d 120, 122 (3d Cir.1986). The Third Circuit appellate court has consistently considered finality for bankruptcy appeals in a more pragmatic and less technical manner than in other situations. In *Walsh Trucking Co., Inc. v. Insurance Co. of North America*, 838 F.2d 698, 701 (3d Cir.1988), *quoting In re Amatex Corp.*, 755 F.2d 1034, 1039 (3d Cir. 1985), the court explained:

The rationale for viewing finality under a less rigorous standard in the bankruptcy area is clear. Bankruptcy cases frequently involve protracted proceedings with many parties. To avoid the waste of time and resources that might result from reviewing discrete portions of the action only after a plan or reorganization is approved, courts have permitted appellate review of orders that in other contexts might be considered interlocutory.

*See also In re Rosemary Brown*, 916 F.2d 120 (3d Cir.1990); *F/S Airlease II, Inc. v. Simon*, 844 F.2d 99, 103 (3d. Cir.1988); *In re Meyertech Corp.*, 831 F.2d 410, 414 (3d Cir.1987). The appellate court went on to hold that "the more flexible standards of finality in reviewing bankruptcy proceedings are equally applicable in the context of appeals of orders of the bankruptcy court to the district court." *Walsh Trucking*, 838 F.2d at 701.

The Third Circuit Court of Appeals has considered the criteria for determining the meaning of "final orders" in the context of an order of a bankruptcy court expunging a creditor's claim against the bankrupt estate. In *Walsh Trucking*, the Court of Appeals concluded that the standard for determining finality under the 1984 Amendments to the Bankruptcy Act was the same as that in effect since the Bankruptcy Act of 1898, i.e., " 'any dispute between a bankrupt and his creditors over a claim or priority was a separate "proceeding" and an order settling such a dispute was appealable.' " *Walsh Trucking* at 700, *quoting In re Saco Local Development Corp.*, 711 F.2d 441, 445 (1st Cir.1983). The Court of Appeals also noted its approval of dictum of two other courts, stating that under the 1984 Act each adversary proceeding should be analyzed independently when determining finality. *See, In re The Charter Co.*, 778 F.2d 617, 621 (11th Cir.1985) ("In bankruptcy proceedings, it is generally the particular adversary proceedings or controversy that must be finally resolved, rather than the entire bankruptcy litigation."); *In re Fox*, 762 F.2d 54, 55 (7th Cir.1985) ("A proceeding to establish a claim against a bankrupt estate is final for purposes of appeal when it is over and done with, even though the bankruptcy goes on.").

The case at hand obviously fits the scenario of *Walsh Trucking*. The order of the bankruptcy court settled a dispute between the Bank and Collated over the Bank's claim in the "commingled" account by expunging the Bank's lien. The adversary proceeding has drawn to a close with nothing more for the bankruptcy court to do. Consequently, this court may properly hear this appeal.

The Third Circuit Court of Appeals has also enunciated other indicia which reflect whether an order from a bankruptcy court is final. The factors which have been considered in determining finality of an order in an adversary proceeding are the impact upon the assets of the bankrupt estate, the necessity for further fact-finding on remand, the preclusive effect of the decision on the merits of further litigation, and whether the interest of judicial economy would be furthered. *See In re Meyertech Corp.* 831 F.2d 410, 414 (3d Cir.1987). Application of these four factors compels the conclusion that the appeal is properly entertained at this time.

The order impacts upon Collated's estate by freeing a deposit account containing $329,767 from a security interest of the Bank. *See In Re Brown*, 803 F.2d at 122

("Where the issue is likely to affect the distribution of the debtor's assets, or the relationship among the creditors, the most pragmatic response will usually be to hear the appeal immediately."). If the Bank's security interest in the "commingled" account is valid contrary to the decision of the bankruptcy court, the Bank could undergo irreparable harm in the event that Collated exhausts the contents of the disputed account. There is no need for further fact-finding on the part of the bankruptcy court. The present adversary proceeding has been tried and determined, leaving nothing more for the bankruptcy court to do. Because of the pending preference action which encompasses all assets of Collated, a decision at this time has the potential to exert a preclusive effect on the merits of further litigation with regard to the assets contained in the "commingled" account. Finally, a decision will further judicial economy by disposing of a single discrete adversary proceeding arising from Collated's Chapter 11 proceeding.

■■■ Having held there is appellate jurisdiction, attention is now turned to the merits. The standard of review of the bankruptcy court is that this court is obliged to defer to that court's findings of fact unless clearly erroneous. Bankruptcy Rule 8013; *In re Morrissey*, 717 F.2d 100, 104 (3d Cir.1983). However, legal questions are subject to plenary review. *In re Sharon Steel Corp.*, 871 F.2d 1217, 1223 (3rd Cir.1989); *Brown v. Pennsylvania State Employees Credit Union*, 851 F.2d 81, 84 (3d Cir.1988); *Hassler v. Assimos*, 53 B.R. 453, 456 (D.Del.1985). The burden of proof is on the Bank because as a creditor, it asserts that the postal funds constitute proceeds of collateral. *Howarth v. Universal CIT Credit Corp.*, 203 F.Supp. 279, 282 (W.D.Pa.1962).

### III. WAIVER OF THE SECURITY INTEREST

■■ Collated argued below that the Bank waived its security interest in the

proceeds of the accounts by virtue of Paragraph 2 of the Settlement Agreement. Paragraph 2 provides that Collated was entitled to use and retain the proceeds of its accounts in its own discretion. The bankruptcy court found that pursuant to N.J.S.A. § 12A:9–205 the Bank's security interest in the proceeds was valid even though Collated was given wide latitude in controlling its assets.[2]

Collated did not cross appeal. The Bank, apparently relying upon *Massachusetts Mutual Life Insurance Co. v. Ludwig*, 426 U.S. 479, 96 S.Ct. 2158, 48 L.Ed.2d 784 (1976), concluded that Collated is entitled to reassert a contention argued and decided below and that Collated could raise the issue of the waiver of the security interest on appeal. It will be assumed without deciding that it may do so.

On appeal, Collated urges the court to interpret Paragraph 2 of the Settlement Agreement in light of certain fine print provisions of the Security Agreement. It is Collated's contention that the bankruptcy court found that Paragraph 2 of the Settlement Agreement served to implement Section 9–205 of the New Jersey Commercial Code and that such an interpretation of Paragraph 2 does not square with subparagraphs (b) and (d) of paragraph 3 of the Security Agreement.

These provisions state that "the Collateral is and will be used in Debtor's business," and precludes assignment, mortgaging or pledging of the Collateral, "except for the sale from time to time in the ordinary course of business of Debtor of such items or Collateral as may constitute part of the business inventory of Debtor."

Collated maintains that these provisions are intended to implement N.J.S.A. § 12A:9–205, and that since these provisions already address Section 12A:9–205, Paragraph 2 of the Settlement Agreement must serve some purpose other than implementing that provision of the New Jersey Code. Collated continues that Paragraph 2 must be construed to mean something

---

**2.** The Security Agreement and the secured note expressly provide that New Jersey law would cover the transaction. N.J.S.A. § 12A:1–105

permits the parties to select the choice of law, which will govern any dispute.

more than furnishing Collated with authority to use the proceeds of its accounts pursuant to its own discretion. Rather, Collated urges Paragraph 2 operates as a waiver of the Bank's security interest in the proceeds.

There is no merit in Collated's argument. First, the bankruptcy court did not find that Paragraph 2 of the Settlement Agreement was intended to implement Section 9–205. Rather, the court below concluded that despite Collated's discretion to use the proceeds, the Bank's security interest was preserved. Indeed, under N.J.S.A. § 12A:9–102, Section 9–205 would be self-implementing for a security agreement of this nature.

Further, under N.J.S.A. § 12A:9–203(3), a security agreement bestows upon the secured party rights to proceeds of its collateral unless otherwise agreed. The court cannot understand how the Settlement Agreement or the Security Agreement caused the proceeds of the accounts to somehow have escaped the coverage of the Bank's security interest. Paragraph 2 does not contain language waiving the Bank's security interest in the proceeds of accounts but rather empowers Collated to utilize such proceeds as it sees fit. Moreover, if the Bank had intended to waive its security interest in the proceeds of Collated's accounts, such proceeds would not have been expressly included in the Schedule of Collateral.

Section 12A:9–205 of the New Jersey Commercial Code authorizes a "floating lien" that relieves a secured creditor from supervising its collateral:

> A security interest is not invalid or fraudulent against creditors by reason of liberty in the debtor to use, commingle or dispose of all or part of the collateral (including returned or repossessed goods) or to collect or compromise accounts or chattel paper, or to accept the return of goods or make repossessions, or to use, commingle or dispose of proceeds, or by reason of the failure of the secured party to require the debtor to account for proceeds or replace collateral. . . .

There is not an abundance of New Jersey precedent on this section of the Uniform Commercial Code. In *In re United Thrift Stores, Inc.*, 363 F.2d 11, 15 (3d Cir.1966), the Third Circuit Court of Appeals, construing New Jersey law, held, *inter alia*, that under Section 9–205 a security interest is not invalid because of the failure of the secured party to police the conduct of the debtor. Other jurisdictions have held there is no waiver of a creditor's security interest arising from its action in permitting the debtor to retain possession of the collateral, including proceeds, and to use them in the ordinary course of business. *National Acceptance Company of America v. Virginia Capital Bank*, 491 F.Supp. 1269, 1274 (E.D.Va.1980). *See also, Brown & Williamson T. Corp. v. First National Bank of Blue Island*, 504 F.2d 998, 1002 (7th Cir.1974); *General Motors Acceptance Corp. v. Norstar Bank, N.A.*, 141 Misc.2d 349, 532 N.Y.S.2d 685 (N.Y.Sup.Ct.1988); *Miracle Feeds Inc. v. Attica Dairy Farms*, 129 Wis.2d 377, 385 N.W.2d 208 (Wis.Ct. App.1986).

By virtue of N.J.S.A. § 12A:9–205, the Bank's security interest in the proceeds of the accounts continues despite Collated's authority to use the proceeds in its own discretion. Since documents executed at the time of settlement evince no intention of the parties to set the proceeds of Collated's accounts beyond the ambit of the Bank's security agreement, the court affirms the bankruptcy court's holding that the Bank had not waived its security interest.

## IV. POSTAGE MONIES AS PROCEEDS OF COLLATERAL

Section 12A:9–306(1) of the New Jersey Code defines proceeds as follows:

> "Proceeds" includes whatever is received upon the sale, exchange, collection of [sic] other disposition of collateral or proceeds. . . . Money, checks, deposit accounts and the like are "cash proceeds". All other proceeds are "noncash pro-

ceeds".[3]

The bankruptcy court found that the payments for postage expenses were not proceeds subject to the Bank's collateral. The court reasoned that such payments could not be deemed to be proceeds since they were neither substituted for nor derived from the Bank's collateral. Rather, the postage payments were only mailing costs which Collated collected from each customer, "escrowed and ultimately paid to the Postmaster for the mailing of that specific customer's card deck." (Dkt. 6A, Exh. B, p. 8.) As such, the postage payments were tangential to the production and sale of the card decks and could not be considered proceeds of collateral.

The bankruptcy court also held that the customers provided postage monies to Collated for the Post Office's performance of mailing the card decks and not for any performance undertaken by Collated pursuant to a contract. Since Collated had no direct right of payment, the bankruptcy court believed that the payments of the postage monies could not be considered a contract right or general intangible subject to the Bank's security interest.

■ Analysis is prefaced by observing that the definition of proceeds found in Section 9–306(1) is to be interpreted broadly and flexibly. *See, In re Munger*, 495 F.2d 511, 513 (9th Cir.1974); *National Acceptance Company of America v. Virginia Capital Bank*, 498 F.Supp. 1078, 1082 (E.D.Va.1980); *In re Stone*, 52 B.R. 305, 307 (Bankr.W.D.Ky.1985); *In re Judkins*, 41 B.R. 369, 372 (Bankr.M.D.Tenn.1984).

■ Contrary to the bankruptcy court, I hold the postage monies are proceeds from the Bank's collateral for the following reasons: 1) Collated has a contractual right to prepayment of postage and contractual rights and proceeds therefrom are included in the Schedule of Collateral; 2) payment for Collated's service of mailing the card decks is in the form of customer prepaid mailing costs; and 3) Collated's treatment of postal monies demonstrates it treated postal payments as its own property.

The record reveals that Collated entered into a contractual relationship with each customer upon its acceptance of the customer's order. Once this contractual relationship was established, Collated would manufacture and mail the card decks in accordance with its customer's instructions and with the procedure set forth in its brochures and specifications. (*See*, Exhibit F in Dkt. 6A.) Customers were obligated to furnish Collated with payments for the mailing of the card decks after the customers' approval of the card deck blueprints and no later than fifteen days prior to the mailing date. Such payments were more than conditions to Collated's obligation to print and mail the card decks; rather these postage payments were obligations which the customer had assumed upon the creation of the contract. Failure to provide such payments would constitute a breach of the contract between Collated and the customer. *See, In re Allegheny Imaging Institute*, 69 B.R. 932, 936 (Bankr.W.D.Pa. 1987) ("It is axiomatic that a breach occurs when one party to the contact fails to perform any contractual duty of immediate performance or violates an obligation or duty. When a contract calls for performance by both parties and one party fails to

---

**3.** The bankruptcy court mistakenly relied upon the 1962 version of Section 9–306(1) of the New Jersey Commercial Code, which reads, "'Proceeds' includes whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of. The term also includes the account arising when the right to payment is earned under a contract right. Money, checks and the like are 'cash proceeds'. All other proceeds are 'non-cash proceeds'".

The Official Reasons for the 1972 Amendments indicate that the second sentence of Section 9–306(1) had been deleted in order to remove the term "contract right" which had been

rendered superfluous because of the elimination of that term from Section 9–106. Previously, a "contract right" was understood to be an "account" before the right of payment became unconditional upon performance by the creditor. Under the current version of N.J.S.A. § 12A:9–106, the term "account" is defined as any right to payment for goods sold or leased or for service rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance. Consequently, "accounts" would include "contract rights" as previously used under the 1962 version of the New Jersey Commercial Code.

so perform, the other contracting party is entitled to consider the agreement breached.") It is concluded prepayment of postage is a contract right which constitutes collateral under the security agreement.

The Bank also argues that the postage monies could be viewed as general intangibles, instruments or proceeds of accounts. The court, however, believes these monies are more aptly characterized as proceeds of accounts. Under Section 12A:9–106 of the New Jersey Commercial Code, an "account" is defined as "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance." The Schedule of Collateral expressly gave the Bank a security interest in "Accounts of the Borrower ... including ... contract rights and any rights to payment for goods sold or leased or *for services rendered ... whether or not such rights have been earned by performance.*" [Emphasis added]. Collated's right to payment of the postage monies for subsequent mailings of the card decks is an account which falls within the ambit of the Schedule of Collateral and is deemed the Bank's collateral.

Under Section 12A:9–306(1), proceeds includes "whatever is received upon the ... disposition of the collateral." While the New Jersey Commercial Code does not define the term "disposition," within the context of Section 9–306(1) that term has been held to mean "the parting with, alienation or giving up of property." *In re Allegheny Imaging Institute,* 69 B.R. 932, 937 (Bankr.W.D.Pa.1987). A customer's discharge of its obligation to provide the postage payments is a disposition of collateral and the postage money which Collated received from its customer's checks is cash proceeds derived from the right to payment. *See, In the Matter of Barkley,* 31 B.R. 924 (Bkrtcy.W.D.Mich.1983) (checks received by debtor in payment for services rendered were proceeds of accounts receivable under broad U.C.C. definition of "account"; the time of payment is immaterial); *In re Air Florida System Inc.,* 49 B.R. 321, 324 (Bankr.S.D.Fla.1985) (money paid to an airline as a result of services ren-

dered in the transportation of passengers was the proceeds of accounts); *Cissell v. First National Bank of Cincinnati,* 476 F.Supp. 474 (S.D.Ohio 1979) (When contract rights ripen into accounts receivable, the account immediately vanishes because of prepayment and the resultant funds are cash proceeds).

The bankruptcy court also erred in finding the postage funds were payments made to the Post Office for mailing the card decks. Rather, it was Collated who undertook to mail the card decks in accordance with its contractual obligation. Collated expressly states in its brochures that it provides full service mailing to its customers. (Dkt. 6A, Exh. F.) The bankruptcy court appeared to regard the federal postal authorities as the entity which effects the mailing of the card decks. However, the term "mailing" precludes such a position. "Mailing" refers to that circumstance where a letter is properly prepared for transmission in the due course of mail, and where it is placed in the custody of the officer charged with the duty of forwarding the mail. *Texas Casualty Insurance Co. v. McDonald,* 269 S.W.2d 456 (Tex.Civ. App.1954); *Satterfield v. Celebrezze,* 244 F.Supp. 190 (W.D.S.C.1965). *See also, Guzman v. City of Perth Amboy,* 214 N.J. Super. 167, 518 A.2d 758 (1986) (in common understanding, mailing essentially means that the letter, with sufficient postage prepaid thereon, is put into the custody of the federal post office authorities). Collated's right to payment of the postage monies arose from Collated's obligation to perform mailing services under its contracts with its customers. The proceeds of these rights fall under the Bank's security interest.

Collated contends that it acted merely as a conduit of the postage funds and that it acquired no ownership rights in the monies. However, Collated did possess a right to payment of the postage expenses, and a contractual right to receive property is the equivalent of a right to property. *United States v. Augspurger,* 452 F.Supp. 659, 669 (W.D.N.Y.1978).

Moreover, the record demonstrates that Collated manifested the attributes of own-

ership with regard to the postage monies.[4] Collated exercised sole authority over the monies placed in its deposit accounts and was free to utilize the funds for whatever purpose it saw fit, provided that Collated still fulfilled its obligation under its contract with its customers. There was no contractual obligation assumed by Collated to retain these funds in a separate account. All interest earned on the Postage Segregated Account or the operating account was for the exclusive benefit of Collated. Collated used postage monies paid by other customers to make up deficits owed to the Post Office by reason of underestimating postage due from other customers. Collated also used these funds to meet its operating expenses when it had a cash shortfall. Counsel argues that Collated seldom utilized the funds in this fashion; however Collated's frequency of use is unimportant. What is important is that Collated in fact could and did exercise control and did use the postage monies to cover cash shortfalls.[5]

■■■■ Section 12A:9–306(4)(a) of the New Jersey Code provides the following:

In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in the following proceeds:

(a) In identifiable noncash proceeds; and *in separate deposit accounts containing only proceeds;* [Emphasis added.]

Upon filing under Chapter 11,[6] the Bank's perfected security interest continues in separate deposit accounts which exclusively consist of proceeds. Under the Schedule of Collateral and N.J.S.A. § 12A:9–306(1), the postage monies in the operating account were proceeds of the Bank's collateral. For all of the above reasons, I conclude the Bank has a perfected security interest in the entire contents of Collated's operating account since that deposit account contained only proceeds of the Bank's collateral.[7]

## V. COMMINGLED ACCOUNTS UNDER SECTION 12A:9–306(4)(d)

N.J.S.A. § 12A:9–306(4)(d) provides that: [i]n the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in the following proceeds:

. . . . .

(d) In all cash and deposit accounts of the debtor in which proceeds have been commingled with other funds but the security interest under this paragraph (d) is

(i) Subject to any right of set-off; and

(ii) Limited to an amount not greater than the amount received by the debtor within 10 days before the institution of the insolvency proceedings less the sum of (I) the payments to the secured party on account of cash proceeds received by the debtor during such period and (II) the cash proceeds received by the debtor during such period to which the secured party is entitled under paragraphs (a) through (c) of this subsection (4).

The bankruptcy court held that under subsection 4(d) the limitation of the secured creditor's security interest in the proceeds

---

**4.** "Ownership" implies the right of possession, enjoyment, control and disposal of the property. *See,* Black's Law Dictionary (5th ed.1979). *See also,* 63A *Am.Jur.2d,* Property § 34 (1980).

**5.** Based upon the above facts, the bankruptcy court mischaracterized the postal monies deposited in the segregated postage account and the operating account as "escrowed" funds.

**6.** Under N.J.S.A. § 12A:1–201(22), an "insolvency proceeding" includes any assignment for the benefit of creditors or other proceedings intended to liquidate or rehabilitate the estate of the

person involved. A Chapter 11 proceeding is of course designed and intended to rehabilitate the estate of the debtor and comes within the scope of this definition.

**7.** Collated argues that the operating account could be regarded as commingled since it also contains monies derived from certain vending machine commissions. Because Collated concedes it did not advance this argument before the Bankruptcy Court (Dkt. 9, p. 26), it is foreclosed from asserting this claim on appeal. *Newark Morning Ledger Co. v. United States,* 539 F.2d 929, 932–33 (3d Cir.1976).

would be determined by the amount of proceeds deposited into the commingled account during the ten-day period prior to initiation of the insolvency proceedings. As a necessary corollary, it held the Bank did not have a security interest to the extent of the $171,071.95 deposited in the "Special Account" in the ten days prior to August 16, the date Collated filed its Chapter 11 petition. The court below also held that subsection 4(d) requires a right of set-off along with the limitation of the security interest in deposits measured by the ten-day rule. The Bank was found to possess no security interest in the "commingled" account because Collated did not deposit any proceeds into that account during the ten-day period prior to the commencement of the Chapter 11 proceeding and because the Bank had no right of set-off in light of Collated's removal of its deposit accounts from the Bank to the Delaware Trust Company.

■ The bankruptcy court erred in its interpretation that a right of set-off must exist before N.J.S.A. § 12A:9–306(4)(d) becomes applicable. Rather, the right of set-off under subsection 4(d)(i) directs that a secured party's claim in a commingled account will be diminished by the amount of set-off as determined by state law. *See Morrison Steel Co. v. Gurtman*, 113 N.J. Super. 474, 274 A.2d 306 (1971). The law is well established that subsection 4(d)(i) was intended to preserve any right of set-off that a bank may have had before subsection (4)(d) took effect. Thus, if a bank had a right of set off superior to a creditor's perfected security interest before subsection (4)(d) took effect, the bank would still have a superior right afterward. *Ford Motor Credit Co. v. Troy Bank & Trust Co.*, 76 B.R. 836, 839 (M.D.Ala.1986). However, nothing in the New Jersey Commercial Code suggests that subsection (4)(d) requires a right of set-off before a security interest continues in ten-day proceeds deposited in a commingled account.

■ The bankruptcy court also erred in concluding that under N.J.S.A. § 12A:9–306(4)(d) the proceeds must actually be deposited into the commingled account during the ten-day period. Subsection 4(d) does not contain language that the proceeds be deposited in the commingled account. Rather, the statute reads in terms of cash proceeds received within ten days without a limitation as to the location of those cash proceeds:

> ... the language in 9–306(4)(d)(ii), "limited to an amount not greater than the amount of any cash proceeds received by the debtor within ten days", means that the secured creditor gets no more from a bank account than the amount of proceeds from *his* collateral that he can prove that the debtor received within the ten days prior to the filing of the petition ... [The secured creditor does not need] to prove that these proceeds were put into the account.... [Emphasis in the original].

2 J. White & R. Summers, *Uniform Commercial Code*, § 25–10, at 464 (3d ed. 1988). The 1972 Official Comment to Section 12A:9–306 further points out that

> Paragraphs 4(a) through (c) substitute specific rules of identification for general principles of tracing. Paragraph 4(d) limits the security interest in proceeds not within these rules to an amount of the debtor's cash and deposit accounts not greater than cash proceeds received within ten days of insolvency proceedings less the cash proceeds during this period already paid over and less the amounts for which the security interest is recognized under paragraphs 4(a) through (c).

*See also, In re Datair Systems Corp.*, 42 B.R. 241, (N.D.Ill.1984) (the amount a secured party can claim from a commingled account is equal to the amount of cash proceeds received by the debtor during the ten days prior to bankruptcy, less the amount paid to the secured party during those ten days); Dillon & Harrell, *Lonely and Misunderstood: The Saga of U.C.C. § 9–306(4)(d)(ii)*, 60 Okl.B.J. 1343 (1989).

■ It follows even if this court were incorrect that the entire postage monies are proceeds of collateral, the Bank nonetheless would have a security interest in the operating account to the extent of

$171,071.95 of cash proceeds received during the ten-day period.

## VI. EQUITABLE CONSIDERATIONS

 The Bank contends that it would be inequitable for this Court to permit Collated to avoid the Bank's security interest through its "commingling" of the postage monies with collateral. N.J.S.A. § 12A:1–103 provides:

> *Unless displaced by the particular provisions of this Act*, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions. [Emphasis added.]

N.J.S.A. § 12A:9–306(4)(d) expressly authorizes commingling. It is held where a debtor simply does that which is permitted by the New Jersey Commercial Code, it has not acted in an inequitable manner.

## VII. CONCLUSION

The bankruptcy court erred in ruling that the postage monies deposited in Collated's operating account were not proceeds of the Bank's collateral. Pursuant to N.J.S.A. § 12A:9–306(4)(a), the Bank's security interest in the contents of the operating account is preserved. Alternatively, if the monies deposited in the operating account are consequently not considered proceeds of collateral, the Bank maintained a security interest in the funds deposited in the operating account in the amount $171,071.95. The decision of the bankruptcy court that the Bank does not have a security interest in the operating account is reversed and remanded to the bankruptcy court for entry of judgement consistent with this opinion.